OPINION
{¶ 1} Appellant, River Oaks Homes, Inc. ("River"), a residential home builder, appeals the judgment of the Lake County Court of Common Pleas, following a bench trial, on its claim for costs incurred to repair defective siding installation by its siding subcontractor, appellee Twin Vinyl, Inc. ("Twin"). At issue is whether the amount of the court's award was against the manifest weight of the evidence. For the reasons that follow, we affirm. *Page 2 
 {¶ 2} Between 2001 and 2004, River built some 43 homes in Lake County, Ohio. River acts as a general contractor and the various trades are performed by subcontractors. In that period, the parties entered a series of oral contracts, pursuant to which River hired Twin to perform vinyl siding installation on each of these houses.
 {¶ 3} In the summer of 2004, one of the homeowners complained to River about the siding. River's sole owner Fred Jones went to the home to follow up on the complaint, and found that no drip edge had been installed over the garage door. Drip edge is a type of flashing installed at the junction of exterior house walls and openings such as doors and windows. Its purpose is to divert rain water from those joints to prevent water penetration and resultant rot to the wood materials beneath the siding. Installation of drip edge requires measuring, bending, and cutting the piece of aluminum coil on a machine called a brake. It generally takes about 15 minutes to make and install drip edge for each window or door. The drip edge is installed prior to the installation of the siding. It is placed on the horizontal surface over the door or window and under the siding above that surface.
 {¶ 4} Upon discovering that drip edge had not been installed over the complaining homeowner's garage door, Mr. Jones made a list of the houses on which Twin had installed siding and inspected each home. He found that on each of the subject houses, Twin had either failed to install or had improperly installed drip edge over the garage door(s) and/or the man door(s) leading into the garage.
 {¶ 5} On June 24, 2004, Mr. Jones wrote a letter to Tom Fobell, vice president of Twin, stating that issues had arisen on many of the houses on which Twin had installed siding. Mr. Jones identified 13 of these houses and provided a list of problems with Twin's siding installation on these houses. Mr. Jones gave Twin until July 15, 2004 *Page 3 
to remedy these problems, and stated that unless they were repaired by that date, River would hire others to make the repairs and would retain any funds owed to Twin to make these repairs and bill Twin for any excess amounts paid for the repairs. According to Mr. Jones, Twin ignored this letter, and River hired other contractors to make the repairs.
 {¶ 6} On June 20, 2005, River filed a complaint against Twin for an unspecified amount, alleging breach of contract, breach of warranty, unjust enrichment, negligence, and defamation. On August 22, 2005, Twin filed an answer and counterclaim for $8,834.37 for work performed pursuant to its oral contracts which River had never paid.
 {¶ 7} A bench trial was held on October 27, 2006, October 30, 2006, October 31, 2006, November 3, 2006, and March 16, 2007. Prior to trial, River withdrew its defamation claim, and the case proceeded to trial on the remaining claims and counterclaim. Following the presentation of River's case, the court granted a directed verdict to Twin on River's unjust enrichment claim. The main issue at trial concerned whether Twin owed a duty to install a drip edge over the garage and man doors of the 43 houses at issue. River also alleged other defects in Twin's work, such as a wavy appearance of some of the siding, nail holes in some siding, some loose pieces of siding, and a failure to properly caulk in some instances.
 {¶ 8} Justin Meister, owner of a siding installation company, testified that when he bids a siding job for a builder, he includes the cost of flashing in the bid price. Kent Powell, sales representative for a company that sells exterior building materials, testified that siding installers purchase aluminum coil from his company and use it to make drip edge. Finally, Michael Bando, a siding contractor, testified the use of flashing over garage and man doors is part of the siding installation process. *Page 4 
 {¶ 9} Eric Voyzey testified he is a partner in AVH, Ltd. ("AVH"), a siding installation firm. He was hired by River to retrofit drip edge at 18 houses. He said that when he is hired to install siding, the builder does not mention the use of flashing; it is assumed that, as the siding installer, he is responsible for flashing the doors and windows of the house. Mr. Voyzey testified that in retrofitting the drip edge at these houses, he lifted the siding above a garage or man door to determine if drip edge had been installed. If it had not been, he simply bent, scored, cut and applied drip edge over the garage and man doors for each of these houses. AVH did not break down its bill for each separate house, but rather billed River the combined total of $4,350 for this work.
 {¶ 10} River also hired AK Construction ("AK") to perform this same corrective work at 23 of the subject houses. No representative from AK testified concerning the methods it used to retrofit the drip edge, whether its methods were necessary, or whether its charges were reasonable. Instead, Mr. Jones testified concerning the corrective measures apparently undertaken by this subcontractor and the invoices it submitted to River. Unlike AVH, AK submitted separate bills to River for work performed on each house. Mr. Jones testified that AK pursued a different method of retrofitting the drip edge. He said AK removed the aluminum casing around the wood substrate above the garage or man door, and used a material called "trimcraft" to cover the substrate. Unlike aluminum flashing used by AVH, trimcraft needs to be caulked and painted by a painting contractor, and this retrofitting method results in higher costs for both labor and material. Mr. Jones testified that under either method, the drip edge needs to be put in place over the door or window. *Page 5 
 {¶ 11} Mr. Jones testified concerning the difference between the repair techniques employed by AVH and AK: "There's no right or wrong way to do it. It's a cosmetic feature, really, that we're talking about, as far as the face of it. The important thing is that the drip [edge] is installed correctly over [the] top. That's what keeps the water penetration from happening later on in time." Mr. Jones testified AVH's method of repairs was acceptable and he had no problems with it. There was no testimony presented that AK's more expensive method of repair was necessary or in any way better than that employed by AVH to retrofit the drip edge.
 {¶ 12} In support of its counterclaim, Mr. Fobell testified that River never paid Twin $5,742.50 that was owed for siding work Twin performed at one of the subject houses. River also failed to pay Twin the balance of $500 for siding work Twin performed at three houses for a total of $1,500. Mr. Fobell testified River also owed Twin for additional "miscellaneous repair work" Twin had performed in the amount of $1,591.87. The total amount claimed by Twin was $8,834.37. He testified that all work was performed in a workmanlike manner and was completed. During the cross examination of River's principal Fred Jones, he conceded River owed a balance to Twin. Mr. Jones testified: "All I know is we owe Twin Vinyl five thousand dollars in total sums."
 {¶ 13} The trial court found that under the parties' oral contracts, Twin was required to install drip edge over all garage and man doors, even though it was not expressly specified by the parties. The court found that Twin breached its contracts with River by failing to install siding in a workmanlike manner. *Page 6 
 {¶ 14} With respect to the 18 homes repaired by AVH, the trial court took the total amount of its bill, i.e., $4,350, and divided it by 18 to arrive at a damage amount for each house in the amount of $241.66.
 {¶ 15} As to the 23 houses on which AK had made the drip edge repairs, the court reduced the separate amounts on 18 of these invoices to $241.66. Since Mr. Voyzey indicated the method of repair he used was appropriate to prevent water penetration and no testimony was presented that the more expensive technique used by AK was necessary, the trial court obviously reduced the invoices presented by AK on these houses to be consistent with the bills submitted by AVH. In doing so, the trial court found the AVH repair method was necessary and the resultant cost was reasonable, and that the more expensive procedure used by AK was not necessary.
 {¶ 16} The trial court also considered the six remaining houses. AKs invoice for 2190 North Bay Drive was $75, and the trial court determined that was the amount of damages sustained by River as to that house.
 {¶ 17} As to 38805 Kyle Cove, Mr. Jones testified he hired Jimmy Cervenko to perform the repairs. River sought $2,988 for this job; however, Mr. Cervenko did not testify. Instead, Mr. Jones testified concerning Mr. Cervenko's work. During Mr. Jones' testimony, the trial court pointed out that Mr. Cervenko's invoice included unrelated work, such as roof repair, and that his bill was unclear concerning the amount attributed to the repair of faulty siding work and retrofitting of drip edge and the amount attributed to the unrelated work. Mr. Jones attempted to explain this problem in the bill by testifying that before Mr. Cervenko went to the house to perform the repairs, they agreed that the amount to be attributed to any siding work would be $650. All other bills were presented after the work was performed and were based on the amount of repairs *Page 7 
and the time spent. In opposition to this testimony, Mr. Fobell testified that after Twin performed this siding job in 2001, the color of the siding faded and the homeowner submitted a warranty claim to the siding manufacturer in 2003. As a result, the house was re-sided by another contractor in that year so that any alleged defect with that house was not Twin's fault. No testimony was presented concerning how Mr. Cervenko repaired the siding. In finding that River had failed to prove any liability for this bill, the trial court obviously discredited Mr. Jones' testimony and found Mr. Fobell's testimony credible.
 {¶ 18} As to 10776 Ellison Creek, AK charged Twin $2,978.61, but this bill included unrelated items. There was no invoice or other evidence attributing any particular amount to the installation of drip edge or any other item of AK's work. Mr. Fobell testified that the reasonable cost of the punch list items submitted by River for this job, excluding the drip edge, would have been $150. He also said that the additional work invoiced by AK, such as skylight, roof, and basement repair, was not related to Twin's siding installation. The trial court's award of $500 included $241.66 for the drip edge plus the amount referenced by Mr. Fobell for the punch list items.
 {¶ 19} With respect to 10952 Stonewycke, AK submitted a bill for door repair in the amount of $435 and the trial court awarded River $500.
 {¶ 20} As to 6040 Nature View Court, AK submitted a bill for $720. Mr. Fobell testified the reasonable cost of repair for the punch list items on this house, including the drip edge, would have been $200. The court awarded River $550.
 {¶ 21} Finally, as to 7699 Keystone, AK submitted a bill for $315, and the court awarded River $300. *Page 8 
 {¶ 22} While River claimed $22,943.91 in damages, the trial court found that as a direct result of Twin's breach, River sustained damages totaling $10,624.76 as the cost to repair Twin's unworkmanlike performance and entered judgment for River in this amount. The court then found that River breached its contracts with Twin by failing to pay the amount River still owed to Twin in the total amount of $8,834.37 and entered judgment for Twin in this amount. The court then offset the two judgments and awarded to River a net judgment in the amount of $1,790.39.
 {¶ 23} Both River and Twin appealed the trial court's judgment; however, Twin withdrew its appeal in its appellate brief. River asserts two assignments of error. Since the issues raised in both assigned errors are interrelated, they will be considered together. River contends for its assignments of error:
 {¶ 24} "[1] THE TRIAL COURT ERRED TO THE PREJUDICE OF THE PLAINTIFF-APPELLANT BY MAKING A DAMAGES AWARD TO PLAINTIFF-APPELLANT THAT WAS ARBITRARY, UNREASONABLE AND AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.
 {¶ 25} "[2] THE TRIAL COURT ERRED TO THE PREJUDICE OF THE PLAINTIFF-APPELLANT BY MAKING A DAMAGES AWARD TO DEFENDANT-APPELLEE THAT WAS ARBITRARY, UNREASONABLE AND AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE."
 {¶ 26} River argues that the trial court's award of damages in its favor was against the manifest weight of the evidence. A reviewing court will not disturb a trial court's decision regarding its determination of damages absent an abuse of discretion. Windsor v. Riback, 11th Dist. Nos. 2007-G-2775 and 2007-G-2781, 2008-Ohio-2005, at ¶ 43; Williams v.Kondziela, 11th Dist. No. 2002-L-190, 2004-Ohio-2077, at ¶ 19, citing *Page 9 Roberts v. United States Fid. And Guar. Co., 75 Ohio St.3d 630, 634,1996-Ohio-101. "The term discretion itself involves the idea of choice, of an exercise of will, of a determination made between competing considerations." Williams, supra. An abuse of discretion connotes more than an error of law or judgment; it implies the court's attitude is unreasonable, arbitrary, or unconscionable. Blakemore v. Blakemore
(1983), 5 Ohio St.3d 217, 219.
 {¶ 27} In a civil case, an appellate court will not reverse a judgment as being contrary to the weight of the evidence as long as there is some competent, credible evidence supporting the judgment. C.E. Morris Co. v.Foley Construction Co. (1978), 54 Ohio St.2d 279, syllabus; Vogel v.Wells (1991), 57 Ohio St.3d 91, 96. Even if we do not agree with the trial court or might have found differently, we cannot substitute our judgment for that of the trial court. We must give deference to the trier of fact because it is best able to observe the witnesses and their demeanor and to determine their credibility. Seasons Coal Co. v.Cleveland (1984), 10 Ohio St.3d 77, 80. Witness credibility rests solely with the finder of fact. State v. Awan (1986), 22 Ohio St.3d 120, 123. The finder of fact is entitled to believe all, part, or none of the testimony of any witness. State v. McDaniel, 10th Dist. No. 06AP-44,2006-Ohio-5298, at ¶ 3. If the evidence is susceptible of more than one construction, it must be given that interpretation which is consistent with the judgment and most favorable to sustaining the trial court's judgment. Seasons Coal Co., supra.
 {¶ 28} In determining whether the judgment is against the manifest weight of the evidence, the court, reviewing the entire record, weighs the evidence and all reasonable inferences, and considers the credibility of the witnesses. The court determines whether, in resolving conflicts in the evidence, the trier of fact clearly lost its way and *Page 10 
created such a manifest miscarriage of justice that the judgment must be reversed and a new trial ordered. The discretionary power to grant a new trial should be exercised only in the exceptional case in which the evidence weighs heavily against the judgment. State v. Thompkins (1997),78 Ohio St.3d 380, 387.
 {¶ 29} A contract to perform work imposes on the contractor the duty to perform in a workmanlike manner. Mitchem v. Johnson (1966),7 Ohio St.2d 66, paragraph three of the syllabus; McKinley v. Brandt Constr.,Inc., 168 Ohio App.3d 214, 217, 2006-Ohio-3290. "`Workmanlike manner' has been defined as the way work is customarily done by other contractors in the community." Id., quoting Jones v. Davenport (Jan. 26, 2001), 2d Dist. No. 18162, 2001 Ohio App. LEXIS 226, *8. Where a contractor fails to perform in a workmanlike manner, the proper measure of damages is the cost to repair the damage to the condition contemplated by the parties at the time of the contract. McCray v.Clinton County Home Improvement (1998), 125 Ohio App.3d 521, 523-524. In order to place a building in the condition contemplated by the parties at the time of the contract, "repair of deficient work may involve both additional activities necessitated by the deficient work, and activities previously omitted, but necessary, to proper performance in a workmanlike manner." Barton v. Ellis (1986), 34 Ohio App.3d 251, 254. The plaintiff in an action for breach of contract cannot recover damages "beyond the amount that is established by the evidence with reasonable certainty." Kinetico, Inc. v. Independent Ohio Nail Co. (1981),19 Ohio App.3d 26, 30, citing Restatement of the Law 2d, Contracts (1981) 144, Section 352. Finally, a construction contract governs the warranty of good workmanship; therefore, the warranty of good workmanship arises from the contract. Kishmarton v. William Bailey Construction, Inc.,93 Ohio St.3d 226, 228, 2001-Ohio-1334. *Page 11 
 {¶ 30} Twin concedes on appeal that it breached its duty to install drip edge on all garage and man doors at all jobs undertaken by it. Further, River concedes on appeal that the trial court awarded the full amount of damages prayed for on the homes repaired by AVH. River's principal Mr. Jones conceded at trial that AVH and AK's retrofitting methods are equally effective, and that the only difference between them is cosmetic. The court obviously found that the repair method used by AVH was necessary to repair all missing and improperly installed drip edge. Implicit in its judgment is the further finding that AK's repair method was not necessary. River does not challenge the trial court's right to limit its recovery for the cost of drip edge repair to the cost incurred pursuant to AVH's repair method. Instead, River's claims on appeal concern the additional amounts for work allegedly performed by AK and Mr. Cervenko and the amount awarded by the trial court to Twin on its counterclaim.
 {¶ 31} Under its first assigned error, River argues that the trial court was required to accept Mr. Jones' testimony that some houses repaired by AK and Mr. Cervenko required more than the installation of a drip edge and to award it the full amount for all such costs. However, River failed to present the testimony of any representative of AK or of Mr. Cervenko, and instead chose to rely solely on the testimony of its principal to support the amounts billed by these contractors. In considering Mr. Jones' testimony, the court was entitled to consider that he did not observe the repairs allegedly made by AK or Mr. Cervenko, and that Mr. Jones had an obvious interest in the result of the case. The court was not required to blindly accept Mr. Jones' testimony, but rather was entitled to reject all or part of it,Archibald, supra, and instead to rely on the opposing testimony of Mr. Fobell. The trial court was thus not required to accept Mr. Jones' testimony regarding the additional repair work of his contractors, but, rather, was *Page 12 
entitled to give weight to Mr. Fobell's testimony regarding the reasonable cost of this work. We note the invoices submitted by AK and Mr. Cervenko provided no cost breakdown; did not reference many of the items for which River sought recovery; and included unrelated items, for which no amounts were provided to distinguish them from relevant items.
 {¶ 32} We do not agree with River's argument that the trial court failed to analyze "how it decided the amount of damages to assess on each given home." By limiting its award as to 36 houses to the retrofit cost charged by AVH, by reducing the amounts claimed for several houses allegedly requiring additional items consistent with the testimony of Twin's vice president Mr. Fobell, and by not awarding any amount for the items allegedly repaired by Mr. Cervenko, the court made clear the basis of its award as to each house. The court thoughtfully considered the evidence presented as well as River's failure of proof. That the trial court did not accept the entirety of Mr. Jones' testimony and instead chose to believe Mr. Fobell's testimony does not constitute an abuse of discretion. Williams, supra. We cannot say that in reducing the additional amounts billed by AK and in discrediting Mr. Jones' testimony concerning Mr. Cervenko's bill, the trial court lost its way and created such a manifest miscarriage of justice that a new trial was required.
 {¶ 33} Under River's second assignment of error, it argues the trial court's judgment awarding to Twin the full amount of its counterclaim was also against the manifest weight of the evidence. We do not agree.
 {¶ 34} River argues that, because the trial court found Twin failed to perform in a workmanlike manner on two jobs, sublots 113 and 117, the court erred in awarding to Twin the full amount of its invoices regarding these two houses. However, we note that, *Page 13 
while the court determined that Twin was entitled to judgment for the work it had performed, the court offset that judgment against the larger amount awarded to River so that the net judgment was in favor of River only and against Twin.
 {¶ 35} River next argues that Twin failed to establish the amount of its invoices with the required degree of certainty. However, Mr. Fobell testified that Twin performed the work reflected in Twin's invoices in a workmanlike manner and that River failed to pay the amount owed. It is noteworthy that Mr. Jones admitted on cross examination that River owed Twin $5,000 on these jobs so the only amount of Twin's counterclaim River could properly challenge on appeal was $3,800. Mr. Fobell's testimony satisfied the standard of some competent, credible evidence in support of the trial court's judgment.
 {¶ 36} We do not agree with River's contention that the court held it to a higher standard of proof than Twin. As noted, supra, River did not present the testimony of any representative of AK or of Mr. Cervenko, relying instead on the attempts of River's principal Mr. Jones to interpret the invoices of these contractors without any personal knowledge of how these repairs were allegedly performed. The trial court fairly and appropriately challenged Mr. Jones when he testified concerning such matters.
 {¶ 37} Next, contrary to River's argument, Mr. Fobell testified that the $500 balances owed by River on three of the jobs was due to River's practice of withholding that amount when certain materials had not yet arrived on the job site. He testified that all its jobs were complete; that River had no right to retain these amounts; and that Twin was entitled to this payment. Despite River's argument, there was nothing "speculative" about this testimony. Finally, Mr. Fobell testified that Twin's bill for $1,591.87 for *Page 14 
additional "miscellaneous repair work" was for additional repairs made by Twin and owed by River on these jobs.
 {¶ 38} We cannot say that, in awarding judgment to Twin, the trial court clearly lost its way and created such a manifest miscarriage of justice that a new trial was required.
 {¶ 39} The trial court's judgments in favor of River and Twin and its net judgment in favor of River were based on some competent, credible evidence, and were not against the manifest weight of the evidence.
 {¶ 40} For the reasons stated in the Opinion of this court, the assignments of error are without merit, and it is the judgment and order of the court that the judgment of the Lake County Court of Common Pleas is affirmed.
 DIANE V. GRENDELL, P.J., COLLEEN MARY OTOOLE, J., concur. *Page 1