[Cite as *Backer v. Backer*, 2015-Ohio-5334.]

IN THE COURT OF APPEALS

ELEVENTH APPELLATE DISTRICT

ASHTABULA COUNTY, OHIO


SUSAN A. BACKER,                    :        **O P I N I O N**

      Plaintiff-Appellant,        :

      - vs -                            :        **CASE NO. 2014-A-0049**

SCOTT A. BACKER,                   :

      Defendant-Appellee.        :


Appeal from the Ashtabula County Court of Common Pleas, Juvenile Division, Case No. 12 JH 15.

Judgment: Affirmed.


*David M. Lynch,* 333 Babbit Road, Suite 333, Euclid, OH 44123 (For Plaintiff-Appellant).

*Scott A. Backer,* pro se, 465 Lockwood Street, Akron, OH 44314 (Defendant-Appellee).

*Ariana E. Tarighati,* Law Offices of Ariana E. Tarighati, L.P.A., 34 South Chestnut Street, #100, Jefferson, OH 44047 (For Minor Child A.B.).

*Eileen Noon Miller,* Law Offices of Eileen Noon Miller, LLC, P.O. Box 1681, Mentor, OH 44060 (Guardian ad litem).


CYNTHIA WESTCOTT RICE, J.

{¶1} Appellant, Susan A. Backer, appeals the judgment of the Ashtabula County Court of Common Pleas, Juvenile Division, adopting the decision of its magistrate granting custody of her minor daughter, A.B., to her father, appellee, Scott A.

Backer. At issue is whether the trial court abused its discretion in adopting the magistrate's decision. For the reasons that follow, we affirm.

{¶2} The parties were married in August 2005. Mother has a daughter, T.B., now 14 years old, from a prior relationship. A.B. was born in April 2006 and is now nine years old. In March 2008, mother took the children and left father unexpectedly. Mother refused to allow father to have any contact with A.B. for about eight months. Mother then filed for divorce in October 2008. The divorce was final in January 2010. Pursuant to the divorce decree, the parties entered into a shared parenting plan regarding A.B. with no supervision required. Mother was named residential and custodial parent for school purposes.

{¶3} The parties have consistently fought over father's companionship time with A.B. Eventually, A.B.'s previous guardian ad litem moved that the ongoing struggle be transferred to Juvenile Court. That motion was granted, by consent of the parties, in April 2012.

{¶4} On July 31, 2012, father filed separate motions to show cause and for a change in custody due to mother's failure to produce A.B. for father's summer visitation as ordered by the court on June 18, 2012. An evidentiary hearing was set for September 25, 2012, but did not go forward at that time. On September 25, 2012, the new guardian ad litem, Attorney Eileen Miller, filed her initial report, recommending that counsel be appointed for A.B. and that all persons involved undergo a forensic evaluation. By the court's September 25, 2012 order, the trial court appointed A.B. counsel and ordered Psychologist Sandra McPherson, Ph.D., to conduct a forensic

evaluation of the parties and A.B. By that order, the court also placed A.B. with father pending further order of the court and granted mother visitation on alternate weekends.

{¶5} The evidentiary hearing on father's motion to show cause and motion for custody went forward before the trial court's magistrate on four days in May and November 2013. On February 14, 2014, the magistrate filed her decision, granting legal custody of A.B. to father, with mother to have standard visitation, and finding mother in contempt. Mother filed timely objections. By separate judgments entered on July 16, 2014, the trial court overruled mother's objections and adopted the magistrate's decision.

{¶6} On August 7, 2014, mother appealed the court's judgment, assigning the following for her sole assignment of error:

{¶7} "The ruling of the Trial court in continuing custody in the father was against the manifest weight of the evidence."

{¶8} An appellate court reviews a trial court's adoption of a magistrate's decision for an abuse of discretion. *Fortney v. Willhoite*, 11th Dist. Lake No. 2011-L-120, 2012-Ohio-3024, ¶33. An abuse of discretion is a term of art, connoting judgment that does not comport with reason or the record. *Gaul v. Gaul,* 11th Dist. Ashtabula No. 2009-A-0011, 2010-Ohio-2156, ¶24, citing *State v. Ferranto*, 112 Ohio St. 667, 676-678 (1925).

{¶9} Further, in a civil case, an appellate court will not reverse a judgment as being contrary to the weight of the evidence as long as there is some competent, credible evidence supporting the judgment. *C.E. Morris Co. v. Foley Construction Co.*, 54 Ohio St.2d 279 (1978), syllabus; *Eastley v. Volkman*, 132 Ohio St.3d 328, 2012-

3

Ohio-2179, ¶14-15 (reaffirming and clarifying *C.E. Morris, supra*). "Even if we do not agree with the trial court or might have found differently, we cannot substitute our judgment for that of the trial court." *River Oaks Homes, Inc., v. Twin Vinyl, Inc.*, 11th Dist. Lake No. 2007-L-117, 2008-Ohio-4301, ¶27. "We must give deference to the trier of fact because it is best able to observe the witnesses and their demeanor and to determine their credibility." *Id.*, citing *Seasons Coal Co. v. Cleveland*, 10 Ohio St.3d 77, 80 (1984). "Witness credibility rests solely with the finder of fact." *River Oaks, supra.* "The finder of fact is entitled to believe all, part, or none of the testimony of any witness." *Id.* If the evidence is susceptible of more than one construction, it must be given that interpretation which is consistent with the judgment and most favorable to sustaining the trial court's judgment. *Seasons Coal Co., supra*.

{¶10} In determining whether the judgment is against the manifest weight of the evidence, the court, reviewing the entire record, weighs the evidence and all reasonable inferences, considers the credibility of the witnesses, and determines whether, in resolving conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the judgment must be reversed and a new trial ordered. *River Oaks, supra,* at ¶28. "The discretionary power to grant a new trial should be exercised only in the exceptional case in which the evidence weighs heavily against the judgment." *Id.*, citing *State v. Thompkins*, 78 Ohio St.3d 380, 387 (1997).

{¶11} In support of her assignment of error, mother references evidence she presented at the hearing that in 1992, father was convicted of public indecency. However, that offense occurred 24 years ago, and there is no evidence father committed any other offenses after that time. Mother also points to evidence in the

4

record, which, she argues, shows that father sexually abused A.B. Mother testified that A.B. would return from visits with her father depressed and clingy and started wetting her bed. Mother's older daughter, T.B., testified regarding three pictures allegedly drawn by her half-sister, A.B., in a notebook depicting father sexually molesting her. T.B. said that A.B. told her about these alleged incidents.

{¶12} The magistrate found T.B.'s testimony regarding the sexual abuse allegations to be inconsistent with that of mother. The magistrate also questioned T.B.'s credibility and the truth of A.B.'s allegations.

{¶13} The magistrate noted that Dr. McPherson in her report also questioned the credibility of A.B.'s sexual-abuse allegations. Dr. McPherson completed a forensic evaluation of the parties and A.B. Dr. McPherson stated in her report that A.B.'s responses during her interview were "extremely suspect when it comes to whether they represent reality or some form of coaching." Dr. McPherson noted that, throughout her interview with A.B., the child was concerned about what might be the right answer. While Dr. McPherson said she could not be certain, she said the allegations of sexual abuse "appear much more likely false than not."

{¶14} As for the pictures allegedly drawn by A.B. in the notebook, Dr. McPherson stated in her report the idea that A.B. would sit down with a notebook and spontaneously illustrate acts of sexual abuse was "unlikely as a way of suddenly disclosing an abuse event." She said "the notebook is not persuasive of the truth of the allegations," but, rather, "has become a major reinforcement for the child to believe in the facts of abuse, even if the entire sequence represents a false memory of events that have never transpired. The repeated presentation of this 'evidence' influenced her in

5

ways that are potentially severely damaging to how she views herself, her father, and how she will be scripted for future relationships. Clearly, the ongoing prompting and involvement of the child in this scenario is taking place as a function of the parenting time that mother has with the child."

{¶15} Further, Dr. McPherson said that A.B.'s "emotional responses were not consistent with having been victimized." For example, Dr. McPherson said that A.B. never showed any real distress. Dr. McPherson considered the veracity of the molestation allegations unlikely, especially since A.B. displayed none of the fear toward her father that molested children usually manifest in the presence of their victimizers. Rather, she was comfortable with father and appeared warm and friendly toward him. Dr. McPherson said that A.B. is "friendly, happy, affectionate [with her father] and looks to her father for support and assistance in ways that speak to a normal and healthy relationship." Dr. McPherson said that A.B. "has absolutely no problems being with her father, contemplating being with her father, nor does she indicate concern that these kinds of activities would ever re-present." Based on her interview with A.B., Dr. McPherson concluded that father and A.B. have "a happy and mutual relationship."

{¶16} Dr. McPherson concluded that "the allegations of sexual abuse are not adequately supported and are more likely in response to input from mother and at this point also from older sister. The perception that the allegations support a return of the child to the mother could play a part in what is believed and/or reported as well."

{¶17} Further, the magistrate noted that mother had made at least three referrals to the Ashtabula County Children Services Board regarding sexual abuse of A.B. by father, but, each time, the Board found the allegations to be unsubstantiated.

6

{¶18} The magistrate noted that mother had been taking A.B. to see a counselor, Brenda Grimes, for eight months before father discovered Ms. Grimes' involvement. Ms. Grimes indicated that mother did not tell her that counseling was court-ordered or that father was to participate as recommended. While Ms. Grimes said she believed the abuse allegations, she reported to Dr. McPherson that A.B. does not show distress when with father and appears happy and unconcerned around him. Ms. Grimes also reported that she has not found any of the markers that are usually seen when children have been sexually abused.

{¶19} Eileen Miller, the guardian ad litem, reported that A.B.'s molestation allegations "have little credibility" for several reasons. First, the allegations are filled with inconsistencies. Second, Ms. Miller said that A.B. is doing well at her new school, which, she said, is unusual for sexually abused children. Third, Anna Terrell, the parenting coordinator, does not believe A.B.'s allegations. Fourth, Ms. Miller said that the Children Services Board had investigated regularly, finding no confirmation of the allegations. Ms. Miller said these and other factors make the truth of A.B.'s allegations "seem less likely." Further, Ms. Miller stated in her report that A.B. "appears to have an affectionate and appropriate relationship with her father with absolutely no fear of contact and appropriate interaction."

{¶20} Moreover, the magistrate found that mother is the parent who has been uncooperative with visitation. Even when working with the parent coordinator, Anna Terrell, mother would hang up on her when Ms. Terrell would make suggestions. In addition, mother failed to facilitate visits between A.B. and father. Ms. Terrell indicated that she believed father would facilitate a relationship between A.B. and mother much

7

more than mother would with father. Further, Dr. McPherson stated in her report that, according to A.B., father is more facilitative of a relationship with mother than mother is of a relationship with father. A.B. said she thinks her father would like for things to be good between father and mother, but that is not the case with respect to mother.

{¶21} The magistrate noted that mother admitted to being in contempt of the court-ordered visitation by not producing the child to father for his court-ordered summer visitation in 2012.

{¶22} The magistrate found that once A.B. was placed with father, visitation between the child and mother went very well. There were no problems with the exchanges and mother has been able to have all of her visits.

{¶23} The magistrate found that, since being placed with father in September 2012, A.B. has been doing very well in her new school in father's community. She has made several new girlfriends; visits with them; and has them over for sleepovers. At the recommendation of Ms. Miller, father obtained a therapist for A.B. and she is presently in therapy.

{¶24} Based on the foregoing evidence and the magistrate's findings, the magistrate decided that legal custody of A.B. should be granted to father; that mother be granted visitation pursuant to the standard companionship order; and that mother, by her own admission, be found in contempt of the court-ordered visitation, but that purge be moot as A.B. is in father's legal custody.

{¶25} While we recognize that mother presented countervailing evidence, our standard of review in this context, i.e., abuse of discretion, is extremely limited and this court cannot substitute its judgment for that of the trial court where it is supported by

8

evidence in the record and reasons provided by the trial court. *Gaul, supra.* In summary, the record discloses the following: (1) father's conviction is remote in time and there is no indication that such behavior is a continuing concern; (2) the molestation allegations were found by the Children Services Board to be unsubstantiated and, according to Dr. McPherson, Ms. Miller, Ms. Terrell, and the magistrate, the allegations lacked credibility; (3) A.B. is thriving while in father's custody; (4) A.B. has a warm and friendly relationship with father; and (5) mother has failed to cooperate with father's visitation while father has a history of facilitating visitation with mother. In light of the foregoing, we cannot say the trial court abused its discretion in adopting the magistrate's decision.

{¶26} For the reasons stated in the opinion of this court, the assignment of error lacks merit and is overruled. It is the order and judgment of this court that the judgment of the Ashtabula County Court of Common Pleas, Juvenile Division, is affirmed.


THOMAS R. WRIGHT, J., concurs,

COLLEEN MARY O'TOOLE, J., dissents with a Dissenting Opinion.

_____

COLLEEN MARY O'TOOLE, J., dissents with a Dissenting Opinion.

{¶27} I respectfully dissent.

{¶28} The majority makes significant use of the report provided by Dr. McPherson to support its decision to affirm the trial court. However, it is important to note that in her report Dr. McPherson states that the results of her evaluation "do not

9

allow a conclusion about the abuse." Yet, while admitting in her deposition that she could make a case "either way," Dr. McPherson opines that she feels that it is more likely that it did not happen. However, she did admit that this left "a lot of room for insecurity."

{¶29} Dr. McPherson stated in her report that the notebook drawings of sexual abuse made by the child are not persuasive of the truth. Dr. McPherson comes to this conclusion despite the fact that:

- The drawings appear to have been made by a child—not an adult;

- The child stated that she made the drawings;

- She has no clear evidence that mother told the child to make the drawings;

- The child told her that the abuse occurred—but it doesn't happen anymore.

{¶30} It is true that the child's older half-sister aided the child in making the drawings. However, Dr. McPherson opined at her deposition that the half-sister believes the drawings to be authentic, and there is no evidence that the drawings are the result of undue influence by the half-sister. The drawings made by the child are persuasive evidence that something may have occurred between father and the child. Further, whether or not abuse has occurred is not the issue: the issue is determining the best interest of the child and whether a change in custody is in her best interest; all other concerns are of secondary importance. *Davis v. Flickinger*, 77 Ohio St.3d 415, 420 (1997), citing, *Pater v. Pater*, 63 Ohio St.3d 393, 403 (1992).

{¶31} Also important is the information provided by the child's therapist, Brenda Grimes, who testified that the child made allegations of abuse against father. Ms. Grimes had sessions with the child from November 2010 through April 2013. Ms.

Grimes testified that she feels that the child was being truthful when she made these allegations and does not feel that the child was pressured by mother to make these claims. To support her conclusion, Ms. Grimes testified that she has not found the child to be untruthful to her. She also noted that the child became very anxious and urinated in her underpants while telling the story. This should have been sufficient for father to be referred for a psychiatric evaluation.

{¶32} Additionally, the alleged abuse occurred in the summer of 2010. Ms. Grimes states that the child told her of the abuse in May 2011. According to her report, Dr. McPherson's first interaction, of only two sessions with the child, did not take place until January 2013. Dr. McPherson notes that the child showed no apprehension about father in 2013 and was warm and affectionate towards him. Dr. McPherson states that if the child were abused she would expect that the child would be anxious around father. Dr. McPherson did not opine as to whether the child would behave warmly toward father if, as the child reported, the abuse occurred, but does not happen anymore.

{¶33} Father was convicted on two counts of public indecency related to two separate incidents that occurred in August and October of 1992. The August incident occurred around 11:00 p.m. and two witnesses testified that father was masturbating in his car, which was parked next to theirs. Father called out to the women and one of the victims, Debra Mikesell, stated to police that she could see that he was masturbating and she could see his genitalia.

{¶34} The October incident occurred around 4:30 p.m. and the two female victims testified that father drove by them very slowly and called out to them that he was

11

masturbating.  However, neither woman reported seeing father's genitalia during this encounter.

{¶35} Father has minimized both to the trial court and this court his prior convictions, and does not take responsibility for his actions.

{¶36} Presented with the information regarding father's convictions for public indecency (on two separate occasions) at her deposition, Dr. McPherson stated that she was under the impression that these incidents involved public urination.  As such she did not delve into these incidents with father—but admits that such inappropriate sexual behavior could be very important to her determination.  While the home-study report noted father's criminal convictions for public indecency, Dr. McPherson did not obtain copies of these court records.  Dr. McPherson admitted that she should have sought these records.  Nevertheless, Dr. McPherson was unaware of the circumstances of father's convictions for public indecency when she wrote her report and apparently accepted his statement that they involved only urinating in public.  The records of father's convictions speak for themselves.

{¶37} Dr. McPherson also admitted that she did not follow-up on an item noted in the home-study: that father was evaluated at a facility named Westcare after his convictions for public indecency.  According to mother's attorney, Westcare assesses people for sexual problems.  Again, Dr. McPherson admitted that it would be important to have this information but she did not request a copy of the Westcare evaluation, nor did the trial court request it.  Despite being presented with the evidence of father's two criminal convictions related to his masturbating in public in front of women on two

separate occasions, Dr. McPherson still stood by the recommendation that she made in her report.

{¶38} This writer is very concerned about the guardian ad litem's and Dr. McPherson's failure to review the public records from father's convictions for public indecency or to request a copy of the Westcare evaluation. Collateral information such as treatment records and law enforcement records, collected prior to a custody dispute, is often valuable as it is less likely to be contaminated by the agenda of a parent seeking custody. Gould & Stahl, *The Art and Science of Child Custody Evaluations: Integrating Clinical and Forensic Mental Health Models*, 38 Fam. & Concil. Cts. Rev. 392, 405 (July 2000). The authors also note that it is indefensible for an evaluator to fail to engage in reviewing such collateral information when conducting a child custody evaluation. *Id.* at 406.

{¶39} Father pleaded no contest to both charges of public indecency from August and October 1992. According to Crim.R. 11(B)(2), a plea of no contest is not an admission of guilt, but is an admission of the truth of the facts alleged in the complaint. *Hollingsworth v. Timmerman-Cooper, Warden*, 133 Ohio St.3d 253, 2012-Ohio-3907, ¶4. Despite his plea of no contest, which is an admission of the facts alleged in the complaint, father continues to minimize and deny that these convictions were related to criminal sexual acts. In his trial testimony father completely denied the police reports, court records, statements and testimony of witnesses that outline, in detail, that he was masturbating in public in August and October 1992. Father maintained his story that he was merely urinating in public on both occasions.

However, father's trial testimony is confusing, contradictory and belies the clear evidence in this case.

{¶40} Father went so far as to later deny that he was ever at the location where the August 1992 incident occurred. Father made this statement after Debra Mikesell appeared at the trial and identified him as the man she saw masturbating in August 1992. Assuming, for the sake of argument, that father would have responded to questions from Dr. McPherson similarly as he testified at trial, we can only speculate what she would have concluded regarding his version of these events.

{¶41} This writer does not have to speculate regarding father's testimony, except to say that in light of his convictions, it appears to border on perjury. Father maintains, despite the significant evidence in the public record, he never engaged in any masturbatory public acts and was merely urinating in public. Father initially maintained that on both occasions he was only urinating in public—outside of his car. Later he denied ever being at the location of the August 1992 incident. However, the records show that he was clearly observed masturbating while inside a car in August 1992 and that he told two women that he was masturbating in his car in October 1992. In the face of such testimony, and father's denials, it cannot be said that mother's concerns for her daughter's safety are unreasonable.

{¶42} Additionally, both of the witnesses to the August 1992 event testified at trial, substantiating their earlier statements to police. It is inconceivable that these two women would have not only made a false police report over 20 years ago, but they would maintain the falsehood by testifying, years later, in this matter. There is evidence in the public record of father's convictions. There was also live testimony regarding

these incidents in the trial court. Father's complete denial of events that are clearly supported by the public record and testimony leaves this writer to conclude that his credibility is extremely suspect.

{¶43} There is no clear evidence in the record that mother prompted the child to make these allegations. The child's half-sister testified that the child produced the drawings of abuse, albeit with the half-sister's aid. There is no evidence in the record that the child's half-sister, while encouraging the child to draw what happened, told her to lie or make false statements. Additionally, the half-sister testified that on one occasion the child engaged in inappropriate sexual behavior with her.

{¶44} We note that Dr. McPherson's report advises father that he should not be sleeping in the same bed with his daughter because, in addition to the obvious reason, it is "inappropriate for an adult male who has periodic nocturnal erections to sleep with a 6-year old child." This begs the question: Why does a father, who claims he has been falsely accused of sexually abusing his daughter, nevertheless continue to sleep in the same bed with her? This writer notes that this change in sleeping arrangements has been made and the child now has her own bedroom. However, this fact alone raises serious questions about father's judgment.

{¶45} Dr. McPherson testified that if father abused his child then he should be in jail and, obviously, the child would not be placed with him. Conversely, Dr. McPherson stated that if father did not abuse the child, placement with mother is problematic as she is likely to maintain and enhance the allegations of the abuse—which is also harmful to the child. Questioned about this conundrum at her deposition, Dr. McPherson opined that the *only* way to guarantee the child's safety would be to place her with *neither*

15

parent. This is the wrong standard: the correct standard is the best interest of the child and which party can provide the child with a safe environment.

{¶46} Mother's alleged hyper-vigilance about the child's alleged abuse must be put in perspective. Father is unable to confront or admit his past convictions for criminal sexual behavior. Dr. McPherson failed to address or investigate this issue in her report. The record contains the child's accusations, the drawings and Ms. Grimes' observations regarding the child. This record does not support the finding that placement with father insures the child's safety, security, or is in her best interest. Father's convictions for criminal sexual behavior—and his complete denial regarding these incidents—presents a far greater threat to the child's safety and welfare than mother's alleged hyper-vigilance.

{¶47} It is not unusual for a court to make one parent the residential parent when the other has a history of interfering with visitation. What is extremely unusual is for a court to make one parent the residential parent when there are credible (if unproven) allegations of sexual abuse of the child by that parent, and that same parent has a history of criminal sexual behavior that they vehemently deny, despite public records and testimony proving same. Such a decision neither comports with reason nor the record.

{¶48} Despite mother's past interference with visitation, the overwhelming evidence in the record supports her being made the custodial parent. The record belies Dr. McPherson's analysis and conclusions, which were based, in part, on an incomplete knowledge of the facts due to her failure to conduct a complete investigation.

**{¶49}** This writer cannot ignore the fact that Dr. McPherson, even without knowing about father's convictions for criminal acts of a sexual nature, or about his trial testimony wherein he completely denied these events, concluded that this was a case that left a "lot of room for insecurity." While Dr. McPherson may not have been aware of these facts concerning father, this writer has the advantage of the complete record.

**{¶50}** Given the amount of "insecurity" in this case, this writer concludes that the trial court's judgment comports with neither reason nor the record.

**{¶51}** I respectfully dissent.