[Cite as *TRAX Constr. Co. v. Reminderville*, 2021-Ohio-3484.]

# IN THE COURT OF APPEALS OF OHIO
## ELEVENTH APPELLATE DISTRICT
## LAKE COUNTY

| | |
|---|---|
| TRAX CONSTRUCTION CO., | **CASE NO. 2021-L-002** |
| Plaintiff-Appellant, | |
| - v - | Civil Appeal from the Court of Common Pleas |
| VILLAGE OF REMINDERVILLE, et al., | |
| Defendant-Appellee. | Trial Court No. 2018 CV 000184 |

**O P I N I O N**

Decided: September 30, 2021
Judgment: Affirmed

*O. Judson Scheaf, III, Jeffrey A. Yeager*, and *Elise K. Yarnell*, Hahn Loeser & Parks LLP, 65 East State Street, Suite 1400, Columbus, OH 43215, and *Andrew J. Natale* and *Aaron S. Evenchik*, Hahn Loeser & Parks LLP, 200 Public Square, Suite 2800, Cleveland, OH 44114 (For Plaintiff-Appellant).

*Angela F. Lohan*, Village of Reminderville Law Director, 3382 Glenwood Boulevard, Reminderville, OH 44202 (For Defendant-Appellee).

CYNTHIA WESTCOTT RICE, J.

{¶1} Appellant, TRAX Construction Co. ("TRAX"), appeals from the judgment of the Lake County Court of Common Pleas, after a trial by jury, which found appellee, the Village of Reminderville ("Village"), in breach of contract, but awarded TRAX no damages on the finding of liability. Because TRAX did not object to the jury instructions relating to damages or seek an instruction for (at least) nominal damages on the Village's breach of contract, we hold there was no error in the jury's award of zero damages.

{¶2}    TRAX is a construction company specializing in excavating, repairing, and replacing underground utilities.  By way of its owner and president, Christopher Valletto, TRAX contracted with the Village to perform underground utility construction work, including a new sanitary-force main, a new water main, and new storm sewers ("the Project").  The contract bid was for $2,078,000 and was based upon a specified work schedule which was originally set to commence on June 12, 2017 and finish on October 31, 2017.  At a preconstruction meeting, the parties confirmed that the city of Cleveland and Summit County would be involved in inspecting and paying for a portion of the work; and all contractor pay requests and change orders (work added to or deleted from the original contract) had to be submitted to OHM, the engineering firm used by the Village, for processing before submission to the Village for final approval.

{¶3}    Chad Lewis, an OHM engineer, assisted OHM in drafting the design. According to Mr. Lewis, TRAX was entitled to rely upon the plans set forth in the design, in particular the location of the utilities to be replaced or repaired as depicted in the design. Appellant-Eugene Esser, an engineer for OHM, acted as the Project Manager and as the contractual liaison between TRAX and the Village (Mr. Esser was designated as the Village's engineer outside of his work on the project).  Mr. Scott Hines was OHM's construction manager and was the main point of contact between TRAX and OHM. According to Mr. Valetto, all communications went through Mr. Hines who was in direct contact with Mr. Esser.

{¶4}    Mr. Esser, along with the Village, were responsible for establishing funding for the Project.  According to the Village's Mayor, Sam Alonso, the Village relied upon OHM to properly administer the contract; and, if something noteworthy or important

2

occurred or failed to occur during the course of the Project, the Mayor maintained the Village expected OHM to contact him and/or the Village council to discuss such matters.

{¶5} When TRAX began excavation for the Project, it discovered the project design was flawed; initially, the utilities depicted in the design were not in the location identified. Mr. Hines subsequently advised TRAX to move further down the line as depicted on the plan to address what was shown to be an abandoned water line. When TRAX located this line, it discovered it was not abandoned and, due to certain regulations relating to excavating live lines, the plan needed to be revised. According to Mr. Valletto, the postponement required TRAX to remain on the job and incur additional time and resource costs. OHM, via Mr. Lewis, admitted that TRAX was entitled to rely upon the design plans, including utility locations. And Mr. Lewis, conceded the actual utility locations were different than those depicted on the design plan.

{¶6} In light of the construction delay, TRAX, via Mr. Jeffrey Busch (TRAX's Project Manager), Mr. Valletto, or other representatives, provided OHM, Mr. Hines, Mr. Esser, and the Village with numerous written correspondences requesting, inter alia, progress meetings to discuss factors impacting the project due to the postponement(s) and what was eventually characterized as an "indefinite standby." Overall, some 16 letters were sent between August 3, 2017 and February 23, 2018; ultimately, only two progress meetings were held (the first on October 30, 2017 and the second occurring on November 28, 2017); and, although on-site verbal communications took place, OHM sent a written response to only two of TRAX's letters.

{¶7} As of late November 2017, Mr. Valletto stated TRAX had explained to OHM and the Village, via letter and verbal exchanges, the problems it was experiencing due to the inability to move forward. Specifically, TRAX, through Mr. Valletto, advised the Village

3

and OHM: "we are continually being damaged by our equipment and manpower out there on the project well beyond the completion time and that we are also financing the project and financing additional work that we've been assured payments on and that's basically what we are telling them and that we are tracking these costs." According to Mr. Valletto, no representative of the Village or OHM disputed these points. Indeed, during this timeframe, a point at which construction would be slowed due to potential weather interference, no agent of the Village or OHM advised TRAX to leave the site to avoid further time-and-resource costs.

{¶8} Considering the lack of payment and additional expenditures, TRAX made a public-records request asking the Village to produce all files, including emails and text messages, relating to the changes to the project design, additional-cost claims submitted by TRAX, and the "positions that exist between the Village and its design engineer." TRAX stated it required this information in the event it "must escalate the matter to recover the compensation due." TRAX received no response to the request.

{¶9} On December 12, 2017, nearly six weeks after the original, scheduled completion date, TRAX sent a letter to Mr. Hines, OHM, and the Village regarding a change order and pay application which did not account for its completed work. The letter noted the Village would be in material breach of the contract by failing to timely process payment requests for work performed.

{¶10} On December 27, 2017, TRAX sent the Village and OHM a letter advising that it had not been paid for base contract work and had been unable to confirm the processing of pending payment applications. The letter noted that OHM and the Village represented to TRAX "many weeks ago" that the applications had been submitted but, given the uncertainty and delay, TRAX was concerned the applications were never sent.

4

TRAX requested copies of the submission and any related paperwork regarding the payment applications. The letter also advised that TRAX had sent various letters to the Village and OHM regarding the absence of required design documents, certain interferences with work, and additional-cost claims associated with compensable delays. TRAX noted that despite repeated efforts to mitigate costs, the Village and OHM have failed and refused to follow the provisions of the original contract and timely process accurate payment applications. TRAX received no written response to this letter and no meeting was arranged or held.

{¶11} On January 22, 2018, TRAX, via Mr. Valletto, again wrote the Village and OHM. That letter advised that the Village's finance officer's certificate in the original contract was $897,000 and TRAX has, or will, surpass that level of costs. TRAX expressed serious concern regarding the uncertainties surrounding the certified financing and noted it had endeavored to meet with the Village and OHM but received no response. TRAX stated it was entitled to a revised certificate showing the entire amount of the contract bid. Meanwhile, the letter advised if the Village or OHM disputed any change orders, TRAX requested a meeting. TRAX requested the Village and OHM to respond by the close of business on Friday, January 26, 2018. Mr. Valleto stated he did not receive a response to this letter and no meeting was arranged.

{¶12} Mr. Valletto pointed out that the Village finance officer's certification essentially ensures that funds are available to pay a contractor for work completed. Still, one of the duties of OHM, as project manager, included determining the amount for the Village's fiscal officer to certify. Because the project had gone in an unexpectedly bad direction for TRAX, Mr. Valletto and his associates revisited the contract and found the funds certified, $897,000, were far lower than the $2,078,000 accepted by the Village on

5

TRAX's bid. He noted this discovery was "a big alarm button for us." As such, if TRAX performed more than $897,000 of actual work, it was at risk of not being paid beyond that amount. Thus, TRAX requested the Village to recertify the funds to an amount that would be sufficient to cover expenses to date. Mr. Valletto ultimately admitted he did not fully review the fund-certification aspect of the contract when he signed it on behalf of TRAX. He also admitted he would not have signed it had he known the certification was much lower than the bid.

{¶13} On January 29, 2018, OHM sent TRAX a letter, via Mr. Hines, which, among other things, requested a written schedule for when TRAX intended to return to work on the project. TRAX subsequently responded to this request, stating it could not provide a schedule for returning to work because its billings have reached the limit of the finance officer's certificate in the contract. Moreover, TRAX pointed out that OHM had previously directed it to stop work, and, without a recertification, re-commencing work was not possible. In effect, TRAX stated "OHM is preventing TRAX's performance and delaying TRAX." TRAX demanded the Village and OHM to process its pending pay applications. Mr. Valletto stated he received no response to this missive.

{¶14} In light of the foregoing, on February 1, 2018, TRAX sent the Village and OHM a letter advising them that it had filed the underlying complaint and submitted a copy of the same. TRAX pointed out that, even though it has tried to work with both the Village and OHM, they have essentially ignored all requests for meetings and failed to certify funds for further payments. TRAX stated it remained ready and willing to discuss the issues, but no further work would occur on the project. Also, TRAX emphasized that, because the project had not been recertified and its equipment and materials were sitting idle, the Village had commenced taking its materials. Mr. Valletto stated TRAX had a

6

surplus of stone; the Village, however, without TRAX's permission, began using the materials to backfill potholes and trenches.

{¶15} In their complaint, TRAX alleged fraud/willful concealment, breach of contract, and theft/conversion against the Village; and, against OHM and Mr. Esser, it alleged fraud/willful concealment, negligence, and theft/conversion. The Village filed a counterclaim against TRAX and a cross-claim against OHM and Mr. Esser, seeking, in relevant part, indemnity and contribution from OHM and Mr. Esser.

{¶16} Subsequently, on April 11, 2018, the Village issued a funding certificate in the amount of $2,078,789.55. Later, on May 24, 2018, the Village terminated TRAX for convenience; at that point, TRAX had been paid $979,509.83 for the work it had performed. Meanwhile, the Village filed cross-claims against the OHM defendants seeking indemnity and contribution, with a supplemental cross-claim alleging negligence.

{¶17} Beyond the facts set forth above, Mr. Esser testified that, while acting as OHM's project manager, OHM owed TRAX the duties to take ownership of mistakes, to deal fairly and honestly with it, and to act as a faithful agent, including keeping it fully informed. Mr. Esser stated that such duties also involve being fully informed and communicating with a client in various forms such as writing, email, and verbal contact. He testified that a project manager and engineer has an obligation to be truthful and neither conceal nor fail to disclose important information. Mr. Esser agreed that the foregoing standards applied to OHM's relationship with TRAX and TRAX was entitled to rely upon him and OHM to adhere to these standards.

{¶18} Mayor Alonso testified that having the necessary money to fund a project is important and TRAX was entitled to be concerned if sufficient funds had not been secured. He also agreed that if TRAX was on the project longer than expected, through

7

no fault of its own, it is entitled to the requisite compensation. Moreover, Mayor Alonso agreed that TRAX kept OHM, at the very least, apprised of the entire time and costs it had incurred on the project. And the mayor testified that the Village would remit payment to TRAX to the extent "everything looks good" (with respect to payment applications) to OHM. According to Mr. Hines, all change orders that were approved by OHM were paid by the Village. In fact, Deborah Wordell, the Village's financial officer, seven payment applications were approved, all of which were paid for a total payment by the Village of $979,509.83.

{¶19} Still, according to Mr. Valletto, OHM had repeatedly assured TRAX, via both Mr. Esser and Mr. Hines, it would be paid for the additional time and work, but no such payment was promptly or obviously processed. Contrary to Mr. Valletto's testimony, Mr. Hines testified he did not assure TRAX it would be paid; instead, Mr. Hines observed that the applications relating to the change orders would be reviewed and decisions would be made accordingly.

{¶20} After each party rested, the trial court entered a directed verdict for OHM on TRAX's and the Village's negligence claims, but denied a directed verdict on TRAX's fraud claims. The jury ultimately returned a verdict in favor of the Village on TRAX's fraud claims and in favor of TRAX on the breach of contract claims, but awarded zero damages for the Villages breach of contract. The jury found in favor of TRAX on the fraud claims against OHM and Mr. Esser. The jury also found in favor of the Village against OHM and Mr. Esser on its indemnity cross-claim. The jury found that TRAX's damages were caused exclusively by OHM/Esser due to their concealments and fraudulent actions on which TRAX justifiably relied. OHM and Mr. Esser moved for a judgment notwithstanding the verdict and a new trial, each of which were denied. As outlined above, the jury and

8

judge eventually ordered damages and fees in an amount just under $1.9 million. TRAX now appeals the jury's verdict awarding no damages for the Village's liability on the breach of contract claim. It assigns the following as error:

{¶21} "The jury's award of zero dollars ($0) on its verdict in favor of TRAX against the Village for breach of contract is against the manifest weight of the evidence."

{¶22} TRAX argues the damages award should be reversed and this matter remanded for a new trial solely on damages because this aspect of the verdict is against the manifest weight of the evidence relating to the damages TRAX allegedly suffered.

{¶23} "[A]n appellate court will not reverse a judgment as being contrary to the weight of the evidence as long as there is some competent, credible evidence supporting the judgment." *In re Kangas*, 11th Dist. Ashtabula No. 2006-A-0084, 2007-Ohio-1921, ¶81. The manifest-weight standard of review is the same in a civil case as in a criminal case. *Eastley v. Volkman*, 132 Ohio St.3d 328, 2012-Ohio-2179, ¶17.

{¶24} When applying the manifest-weight standard of review, the reviewing court reviews the entire record, "'weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the [finder of fact] clearly lost its way and created such a manifest miscarriage of justice that the [judgment] must be reversed and a new trial ordered.'" *Eastley, supra*, ¶20, quoting *Tewarson v. Simon*, 141 Ohio App.3d 103, 115, (9th Dist.2001). "The finder of fact is entitled to believe all, part, or none of the testimony of any witness." *River Oaks Homes, Inc. v. Twin Vinyl, Inc.*, 11th Dist. Lake No. 2007-L-117, 2008-Ohio-4301, ¶27.

{¶25} "[W]here the inadequacy of the verdict is so gross as 'to shock the sense of justice and fairness,' or where the amount of the verdict cannot be reconciled with the undisputed evidence in the case, or where it is apparent that the jury failed to include all

9

the items of damage making up plaintiff's claim, the judgment entered on such verdict may be set aside by a reviewing court as being manifestly against the weight of the evidence and contrary to law. *Toledo Rys. & Light Co. v. Mason,* [81 Ohio St. 463 (1910)]; 2 Ohio Jurisprudence (App.Rev., Pt. I), 1660, Section 877." *Sherer v. Smith*, 85 Ohio App. 317, 322 (6th Dist.1949); *see, also, Garaux v. Ott*, 5th Dist. Stark No. 200 CA 00183, 2019-Ohio-2044, ¶22.

{¶26} TRAX notes that, upon a finding of a breach of an agreement, "the law infers damages, and if none are proved, nominal can be recovered." *First Natl. Bank of Barnesville v. W. Union Tel. Co.*, 30 Ohio St. 555, 568 (1876); *see also, Woodrow v. McGuire,* 4th Dist. Scioto No. 1740, 1989 WL 72799, (June 27, 1989), quoting *Vanderpool v. Waddell*, 4th Dist. Lawrence No. 1822, 1987 WL 19853, (Nov. 12, 1987) ("'Where there is a breach of a contract, the law infers damages and if actual damages are not proved, nominal damages may be recovered'").

{¶27} Initially, although TRAX cites law that establishes that nominal damages are recoverable upon proof of liability in a breach of contract case, the Supreme Court of Ohio has definitively qualified that rule. The Court, in *DeCastro v. Wellston City School Dist. Bd. Of Edn.*, 94 Ohio St.3d 197 (2002), pointed out that the rule is somewhat puzzling and consequently held that "unless a significant right is involved, including inequitable assessment of costs, an appellate court should not reverse and remand a case for a new trial if only nominal damages could result." *Id.* at 200. In drawing this conclusion, the Court observed that, applying the maxim "de minimis non curat lex," i.e., the law cares not for small things, a court of appeals should not reverse for the failure to award nominal damages where there is no issue of costs or violation of an appealing party's substantial rights. *Id.*, citing Williston on Contracts (3 d.1968), 208 (other citations omitted). In this

10

respect, and with no allegation that any substantial right was somehow violated by the jury's award of zero damages, TRAX's argument is unavailing.

{¶28} Moreover, the jury instructions on damages provided:

{¶29} "As to damages, if you find by the greater weight of the evidence that the Village of Reminderville breached the contract with TRAX, whether as a result of a failure to provide accurate information in the plans and specifications, or by breaching express contract terms, or both, then TRAX Construction Company is entitled to damages in the amount sufficient to place it in the same position in which it would have been if the contract had been fully performed by the Village of Reminderville to the extent that the damages are reasonably certain and reasonably foreseeable.

{¶30} "You may only award damages the existence and amount of which are reasonably certain and have been proved to you by the greater weight of the evidence. You may not award damages that are remote and speculative.

{¶31} "You may only award those damages that were the natural and probable result of the breach of the contract or that were reasonably within the contemplation of the parties as the probable result of the breach of contract. This does not require that the Village of Reminderville actually be aware of the damages that will result from the breach of contract so long as the damages were reasonably foreseeable at the time the parties entered into the contract as a probable result of the breach."

{¶32} TRAX neither objected to the instruction nor sought an instruction that would legally require the jury to assess "nominal damages" if it found liability for breach on the Village's behalf. Ohio Jury Instructions, CV 501.33(7) provides: "NOMINAL DAMAGES. If you find that the defendant has (breached) (broken) the contract with the plaintiff, and if you further find that the plaintiff has failed to prove any damages calculated according

11

Case No. 2021-L-002

to these instructions, you may award the plaintiff nominal damages. "Nominal" means trifling or small. Nominal damages are generally $10 or less." In light of this provision, TRAX could have sought a jury instruction on nominal damages. Because it did not do so, the jury was not placed on notice that nominal damages were possible.

{¶33} Regardless, given the content of the actual instructions, the jury could have found the Village, in some capacity, breached the contract, but, in light of OHM's status as administrator of the contract, that any damages resulting from the Village's breach were neither reasonably certain nor foreseeable. And, in light of the jury's conclusion regarding the OHM defendants' commission of fraud, the jury could conclude that no damages were "the natural and probable result" of the Village's breach.

{¶34} TRAX's assignment of error lacks merit.

{¶35} For the reasons discussed in this opinion, the judgment of the Lake County Court of Common Pleas is affirmed.

MARY JANE TRAPP, P.J.,

MATT LYNCH, J.,

concur.

Case No. 2021-L-002