[Cite as *In re J.L.*, 2018-Ohio-2073.]

## IN THE COURT OF APPEALS

## ELEVENTH APPELLATE DISTRICT

## TRUMBULL COUNTY, OHIO

IN THE MATTER OF:                    :        **O P I N I O N**
J.L., L.L., AND C.L., DEPENDENT
CHILDREN.                            :
                                     :        CASE NO.  2018-T-0015
                                     :

Appeal from the Trumbull County Court of Common Pleas, Juvenile Division, Case No. 2015 CH 00017.

Judgment: Affirmed.

*David L. Engler,* Engler Law Firm, 181 Elm Road, N.E., Warren, OH  44483 (For Appellant, Rebecca Horton).

*Tammy Richardson,* Trumbull County Children Services Board, 2282 Reeves Road, N.E., Warren, OH  44483 (For Appellee).

*Michael R. Babyak,* 51 East Park Avenue, Niles, OH  44446 (Guardian ad litem).

CYNTHIA WESTCOTT RICE, J.

{¶1}  Appellant, Rebecca Horton ("mother"), appeals the judgment of the Trumbull County Court of Common Pleas, Juvenile Division, granting the motion of appellee, Trumbull County Children Services Board ("the agency"), for permanent custody.  At issue is whether the judgment was against the manifest weight of the evidence.  For the reasons that follow, we affirm.

{¶2}  On May 6, 2015, Juv.R. 6 was exercised, placing mother's children, J.L., age 12; L.L., age 10; and C.L., age nine, into foster care.

{¶3} On May 7, 2015, the agency filed a dependency complaint and a motion for ex parte temporary custody of the children. The ex parte motion was granted the same day.

{¶4} The children were adjudicated dependent and, by court order, placed into the agency's temporary custody on June 11, 2015. On April 28, 2016, the court granted a six-month extension of temporary custody to the agency. On October 5, 2016, the court granted a second six-month extension of temporary custody to the agency.

{¶5} On October 21, 2016, the agency filed a motion for permanent custody of the children. No other motions for custody were filed on behalf of the parties or relatives.

{¶6} The children's father signed a voluntary permanent surrender of parental rights to the agency.

{¶7} The permanent custody trial was held by the magistrate on nine days between February 8, 2017 and May 10, 2017.

{¶8} Daphne Markakis, an agency caseworker, testified that in the spring of 2015, the agency received three referrals regarding the children, who were living with mother at the time. The first referral came in shortly before May 1, 2015, and involved concerns regarding mother's alcohol abuse and her mental health issues.

{¶9} The second referral was received on May 1, 2015, alleging that mother was highly intoxicated at L.L.'s school talent show. The referral also involved concerns that mother was making the children walk to West Virginia.

**{¶10}** The third referral was received one week after the second, and alleged mother tried to drown C.L., the youngest child, in the bathtub and that mother was getting rid of all their possessions.

**{¶11}** After a determination was made that the agency had enough evidence to take custody of the children, Ms. Markakis removed them from school and they went with her willingly. They said they were afraid to go home because they were concerned mother would make them walk to West Virginia with her and they did not want to go.

**{¶12}** After the children were removed, Ms. Markakis went to mother's home. Ms. Markakis said the home was so cluttered, she could barely walk through it. There were dirty clothes, blankets, bugs, and flies "all over the place." Stuffed boxes were on the curb along with the family's furniture and mattresses. The children's bedrooms had no furniture in them and the children were sleeping at night in a tent in the backyard.

**{¶13}** Ms. Markakis attempted to talk to mother, but she was so irate, Ms. Markakis could not carry on a civil conversation with her.

**{¶14}** At the agency, Ms. Markakis talked to the children. They said mother was throwing out their things to prepare for their walk to West Virginia. The children were frightened and confused about mother's decision to do this.

**{¶15}** L.L. told Ms. Markakis about the recent talent show at school. She said she knew mother was drunk at the time because she was screaming and clapping loudly, although no one else was. L.L. said the principal tried to talk to mother and eventually asked her to leave. Mother became angry and dragged L.L. out of the school before her performance.

{¶16} The children told Ms. Markakis about the bathtub incident in which mother tried to drown C.L. in early May 2015. C.L., then nine years old, said that mother was yelling at him for something he did that day. While he was in the bathtub, she was pushing his head under the water and he was fighting with her to try to get her to stop.

{¶17} J.L., then age 12, and J.L., age 10, were not in the bathroom at that time, but they said they heard C.L. screaming and crying, but were too afraid to intervene.

{¶18} The agency's caseworker, Jared Wert, testified that, as of the date of his testimony, the children had been in foster care for nearly two years. He said the children were also removed from mother twice in Mahoning County in 2010. They were first removed in September 2010 for a short time due to concerns that the children's parents had engaged in domestic violence and, again, in October 2010 for a year and a half due to concerns that mother was "out of control" and "under the influence" of alcohol and was "a danger to the children."

{¶19} Mr. Wert testified that under the original case plan, which was filed in this case on June 2, 2015, mother was required to complete a drug and alcohol assessment; to submit to random urine screens within two hours of a request by a caseworker; to complete a psychological evaluation; and to maintain employment, independent housing, and financial stability.

{¶20} By February 2016, mother secured a part-time job at a scrap-hauling company, which she later lost; completed a psychological evaluation; and completed drug and alcohol treatment at Glenbeigh in December 2015.

{¶21} However, Mr. Wert and the children still had concerns about mother's sobriety and mental health. After she completed treatment at Glenbeigh, she did not

4

comply with numerous attempts to obtain random urine screens at her home, in violation of her case plan.

{¶22} Mr. Wert said he has seen mother talking to herself in a bizarre manner during visitation at the agency. On one occasion, she was sitting by herself, saying "Leave me alone. Get out of here." On another occasion, while mother was talking to someone who was not there, she stated "big fat pig." Mr. Wert said that C.L. told him he is afraid to return home to mother because she talks to invisible people and to shadows. The two other children also said they saw mother talking to herself and this behavior frightens them.

{¶23} Due to Mr. Wert's ongoing concerns about mother's mental health, he amended the case plan in April 2016 to require her to participate in a specialized parenting assessment at Northeast Ohio Behavioral Health.

{¶24} That assessment was conducted by Dr. Aimee Thomas, Ph.D., a licensed psychologist and professional clinical counselor. Dr. Thomas testified that mother told her the children were removed because they said she tried to drown C.L. and because, as she admitted, she was drinking alcohol at that time and, in fact, was drinking the day before the agency removed the children. She said she was drinking three 24-ounce beers several times a week.

{¶25} Dr. Thomas said she was concerned about the previous removal of the children due to mother's drinking when she lived in Mahoning County because she failed to disclose it to her and, further, because it shows mother does not learn from her past mistakes. Dr. Thomas also said it shows a lack of commitment to addressing her alcohol abuse and mental health issues. Although mother acknowledged she fits the

5

criteria for being an alcoholic and should never drink, she was not willing to admit she is alcohol-dependent or that she needs to maintain sobriety.

{¶26} When asked when she last drank alcohol, mother vaguely said "a long time ago" in 2015. However, this was contradicted by the fact that she tested positive for alcohol on May 17, 2016, *just ten days after mother completed Dr. Thomas' evaluation.* Dr. Thomas said she was concerned that mother was still drinking after her treatment at Glenbeigh in December 2015. Further, between January and April 2017, she tested positive for alcohol and refused to give specimens three times. Dr. Thomas said that, although mother completed her treatment at Glenbeigh, she was not committed to attending 12-step meetings; continued to miss urine screens; and gave many adulterated screens. Dr. Thomas testified that, despite having experienced serious negative consequences as a result of her drinking (repeatedly losing custody of her children and subjecting them to foster care), mother continued drinking even while her case plan was open, which shows she does not accept that her disease is "significant." Dr. Thomas said if this is not remedied and reunification is granted, mother's alcohol abuse will likely continue and the agency will have to intervene and remove the children again.

{¶27} Dr. Thomas testified that, in addition to being alcohol-dependent, mother has serious mental health issues. The doctor said that, based on her observations, mother's defensiveness, her psychological test results, reports about mother's psychotic behavior, and her previous diagnosis of having bipolar disorder, Dr. Thomas diagnosed her as having bipolar disorder with psychosis. Individuals with bipolar disorder cycle into high (manic) or low (depressed) states. Further, people with bipolar disorder with

6

psychosis may function well when they are not cycling, but often experience psychosis when they are in a manic or depressed state. While appellant insisted she is not bipolar, witnesses have seen her engage in behaviors that Dr. Thomas characterized as symptoms of the manic phase of this disorder. These include mother's bizarre statements to people who are not present, as reported by the children and Mr. Wert. In addition, mother was seen picking up trash in the road and around Dr. Thomas' office. The doctor was concerned that mother repeatedly said she loves picking up garbage. Dr. Thomas said this conduct suggests psychosis; however, when she recommended counseling to mother, she became defensive and said she did not want it.

{¶28} Dr. Thomas said that mother's bipolar disorder is chronic and medically-based and, left untreated, may cause mother to self-medicate with alcohol when she is depressed, resulting in other impulsive behaviors. Dr. Thomas said mother needs treatment for both her alcohol dependency and her mental health issues.

{¶29} Dr. Thomas expressed concern about the statement made by C.L., mother's youngest child, that he is afraid to go to school or to a friend's house because he is worried that his mother will drink while he is gone. Dr. Thomas said that when a parent is alcohol-dependent, it is not uncommon for the child to be so preoccupied with worry about the parent's drinking that their roles become reversed and the child cannot fully focus on school or himself, which can impact the child's self-esteem and peer relationships.

{¶30} Dr. Thomas issued her report and recommendations on June 24, 2016. She recommended that mother participate in mental health treatment and a psychiatric evaluation and that she identify an AA sponsor; attend two 12-step meetings each

week; and maintain her sobriety. Dr. Thomas also recommended that mother not regain custody unless and until she addresses her alcohol and mental health issues for nine months. Mr. Wert amended mother's case plan to include these recommendations.

{¶31} However, Mr. Wert said he was never able to confirm that mother obtained a sponsor or that she was attending AA meetings. Further, he said she did not maintain nine months of sobriety because, since January 2017, she refused three requests for urine screens, *including a request on April 4, 2017, two months after the trial began*. Further, mother tested positive for alcohol on January 3, 2017.

{¶32} Mr. Wert said that when the case was first opened in May 2015, mother's alcohol use and mental health were the two key issues that led to the children being taken from the home. He said he currently has safety concerns for the children due to mother's ongoing alcohol use and mental health issues.

{¶33} Mr. Wert said that mother does not demonstrate any insight into the issues that led to the children being removed. By her own admission, she will not stop drinking alcohol. She also denies having any mental health issues and denies that she tried to drown C.L. She told Mr. Wert she was just washing his hair and he started screaming and crying because he did not want to be in the tub. Mr. Wert said that since the children continue to express fear over the bathtub incident and mother does not acknowledge it, he has reservations about reunification.

{¶34} Mr. Wert said that within the last few months, the children have said they do not want to go home. C.L. said he is afraid to go home because he is worried mother will continue drinking and continue talking to people who are not there.

8

**{¶35}** Mr. Wert said he recommends that the agency be granted permanent custody because this is in the children's best interests.

**{¶36}** Stephen Brown, the children's counselor between April and October 2016, testified that all three children were diagnosed with post-traumatic stress disorder and that the traumatic events giving rise to this disorder were mother's attempt to drown C.L. and mother's erratic decision to throw away all their belongings and walk to West Virginia.

**{¶37}** All three children expressed fear about going back with mother due to her drinking and her talking to people who are not there. C.L. said he is afraid mother would not give him his ADHD medication if she is drinking. He also said he is afraid that he would start to see invisible people like mother does. C.L. said he worries all the time that if he goes back home, mother will be drinking. C.L. said he was frightened by the drowning incident to the point where he had recurrent nightmares about it.

**{¶38}** Mr. Brown testified he has concerns about the children returning to mother's home and said that if the children were reunited with mother and had to be removed from her again, this would likely re-traumatize them.

**{¶39}** Angela Cochran, a collection specialist at Braking Point Recovery Center, testified that Braking Point was hired by the agency to conduct drug screening for mother. Between January 2016 and January 2017, random (unannounced) screens were to be taken from mother at her home twice a month per the case plan. The plan required that mother make herself available to screen within two hours of the request and provided that her failure to do so within two hours would be considered a positive screen. When Ms. Cochran would go to mother's home to obtain a screen, i.e., a urine

9

specimen, and no one was home, she would leave a card advising mother of the date and time she arrived and the number to call back.

{¶40} Ms. Cochran said that on many occasions, she arrived for a screening at mother's home, no one answered, and she left her card, but mother never made a return call. On one occasion, when Ms. Cochran arrived for a screening, she knocked on the door and saw mother looking out the window, but she refused to answer. She left her card, but mother did not call back. In February 2016, Ms. Cochran told mother that she had gone to her home several times for random screenings and had left cards, but had not received any return calls. She told mother that even if she received the card outside the two-hour limit, she is still required to call her in order to be compliant with her case plan, but mother still did not make any return calls after that.

{¶41} There were also many occasions when mother was home, but said she could not produce a specimen even after Ms. Cochran waited for 30 minutes.

{¶42} There were also occasions when mother refused outright to give specimens or gave screens that were found by the lab to be adulterated with a supplement called creatine, which is used to mask a diluted urine screen and is sold on the internet. Mother admitted to Ms. Cochran that she was taking this supplement. Between January 2016 and January 2017, the following screening results occurred:

{¶43} In 2016, on *21 occasions*, Ms. Cochran went to mother's house to take a random screen, knocked on the door, no one came to the door, Ms. Cochran left her card, and mother made no return call. Further, on *six occasions*, mother told Ms. Cochran that she was unable to provide a specimen after 30 minutes. In addition, on *20 occasions*, mother gave Ms. Cochran specimens that were found by the lab to be

10

diluted. Further, on *four* occasions, mother refused to give specimens. And, on May 17, 2016, mother's urine tested positive for the presence of alcohol.

{¶44} In January 2017, on one occasion, mother was not home when Ms. Cochran arrived and made no return call. On two occasions, the specimens were found to be diluted. Further, mother refused to give specimens three times. And, one specimen mother provided tested positive for the presence of alcohol.

{¶45} Ms. Cochran testified that some months earlier, mother told her that as soon as this case is over, she intends to drink alcohol.

{¶46} Mother's mental health records from Turning Point Counseling Center, an outpatient mental health center, outline mental health and substance abuse concerns regarding mother from 2001 to 2014. During this period, Turning Point's staff made several mental health diagnoses for her, including schizoaffective disorder, bipolar disorder, alcohol dependency, mood disorder, and polysubstance abuse. Her symptoms included psychosis, erratic behavior, mood swings, irrational and obsessive thought, delusions, hearing voices, and visual hallucinations.

{¶47} As an example of the erratic, impulsive behaviors to which Dr. Thomas testified mother is prone, the agency presented the testimony of William Nicholas, owner and funeral director of Nicholas Funeral Home in Niles.

{¶48} Mr. Nicholas testified that mother attended calling hours for a deceased relative on February 11, 2017 (shortly after the trial in this matter began). Mr. Nicholas was acting as a greeter at the door when he saw mother arrive. She started talking to two men who were already there. She frequently left the building with them and, finally, they went for a long walk. When they returned to the parking lot, they were loud and

boisterous and laughing so loudly they could be heard inside the funeral home. Mr. Nicholas said mother's conduct was not in keeping with the otherwise reverent tone of the funeral and continued when she entered the building.

{¶49} The funeral started at 6:00 p.m. and mother left her seat and went into the bathroom. Once inside, she started slamming the door and yelling obscenities. At the request of the deceased's mother, Mr. Nicholas removed mother from the building.

{¶50} Michael Babyak, the children's guardian ad litem, testified the two principal reasons the children do not want to return to mother are her drinking and her talking to people who are not there. Mr. Babyak said that mother has not been consistent with her sobriety. In fact, her alcohol dependency has been consistent throughout her past and present. There have been many missed, adulterated, and refused screens. Thus, she has not shown that reunification should occur, and he would be concerned for the children's safety if they should be returned to her.

{¶51} Mr. Babyak said the children have told him that when mother talks to imaginary people, she often gets angry and "cusses" at these "people." The children said that when she talks to herself, they are uncomfortable and afraid of her.

{¶52} Mr. Babyak said he observed a video of a visit with mother and the children at the agency during which she told them that after the case is closed, she was going to continue drinking because she is an adult and it's legal. J.L. responded by saying, "well, it is illegal if your kids are in foster care."

{¶53} Shortly after the children came into care, they told the guardian the reason they were here is because of mother's drinking. They said they often have to clean up after her because she passes out in the middle of the day.

{¶54} With respect to the bathtub incident, C.L. told the guardian that he believes mother was trying to harm him. C.L. said he knew mother was drinking during this incident because she was holding a beer bottle at the time. The other children also believed she was drinking during this incident. Mother told the guardian that the children are lying, but the guardian said C.L. was visibly scared and shook up when discussing this incident.

{¶55} The children have been living with the same foster family, the Floyds, for two years. When Mr. Babyak asked the children what they want to happen, they said they love mother and want to go back with her, but if she is still drinking, they do not want to return. When asked about adoption, they said if it is by the Floyds, they would be okay with it. The children get good grades in school. They love the Floyds and their children. They get along well in their foster home and are bonded to the Floyds.

{¶56} Mr. Babyak said that, while mother accomplished some of her case plan goals, her mental health and alcohol issues remain. He said the main goal is maintaining her sobriety and she has not done that, as evidenced by her erratic urine screens. He said these issues are significant enough to terminate mother's parental rights.

{¶57} In view of the foregoing, Mr. Babyak recommended that permanent custody be given to the agency.

{¶58} Significantly, mother did not testify and, thus, did not dispute the agency's evidence that she is still alcohol-dependent and has not resolved her mental health issues.

13

{¶59} After a nine-day trial, on May 26, 2017, the magistrate issued a 12-page, single-spaced, highly-detailed decision granting permanent custody of the children to the agency. Mother filed objections. The court overruled the objections and entered judgment approving the magistrate's decision. Mother appeals that judgment, asserting two assignments of error. For her first, she alleges:

{¶60} "The trial court's decision was against the manifest weight of the evidence."

{¶61} "In cases involving the termination of parental rights, an appellate court applies the civil manifest weight of the evidence standard of review." *In re A.L.A.*, 11th Dist. Lake Nos. 2011-L-020 and 2011-L-021, 2011-Ohio-3124, ¶91. "According to this standard, '"[j]udgments supported by some competent, credible evidence going to all the essential elements of the case will not be reversed by a reviewing court as being against the manifest weight of the evidence."'" *Id.*, quoting *In re D.H., C.H., and R.H.*, 11th Dist. Geauga No. 2009-G-2882, 2009-Ohio-2798, ¶21, quoting *C.E. Morris Co. v. Foley Construction Co.*, 54 Ohio St.2d 279 (1978), syllabus. Witness credibility rests solely with the finder of fact. *River Oaks Homes, Inc. v. Twin Vinyl, Inc.*, 11th Dist. Lake No. 2007-L-117, 2008-Ohio-4301, ¶27.

{¶62} R.C. 2151.414(B) sets forth a two-prong test for the trial court to grant permanent custody. Under R.C. 2151.414(B)(1), the court may grant permanent custody if the court finds, by clear and convincing evidence, that (1) at least one of four factors in R.C. 2151.414(B)(1)(a)-(d) applies and that (2) it is in the children's best interests to grant permanent custody to the agency.

**{¶63}** Here, the trial court found that the factor in R.C. 2151.414(B)(1)(d) applies, namely, that the children have been in the temporary custody of the agency for 12 or more months of a consecutive 22-month period. Thus, under R.C. 2151.414(B)(1), the court would then be required to weigh the best interest factors in R.C. 2151.414(D)(1).

**{¶64}** In 2009, the Legislature amended R.C. 2151.414(D). Prior to that time, the only best interest test was the one set forth in the current version of R.C. 2151.414(D)(1). The amendment of the statute added another best interest test in R.C. 2151.414(D)(2). *In re H.C.*, 7th Dist. Harrison No. 13 HA 5, 2013-Ohio-5871, ¶24.

**{¶65}** Under R.C. 2151.414(D)(2), if all four factors listed therein apply, permanent custody is in the best interests of the child and the court is required to grant permanent custody to the agency. *H.C.* at ¶31-32. These factors are that: (a) one of the factors in R.C. 2151.414(E) applies and the child cannot be placed with a parent within a reasonable time; (b) the child has been in the agency's custody for two years or longer; (c) the child does not meet the requirements for a planned permanent living arrangement; and (d) no relative has filed a motion for custody. Here, the trial court found that all four factors apply.

**{¶66}** Mother does not dispute that three of the factors in R.C. 2151.414(D)(2)(b)-(d) apply, but argues that the factor in (a) does not apply because, per that factor, the court was required, but failed, to find that any of the factors in R.C. 2151.414(E) applies.

**{¶67}** However, to the contrary, the trial court found that R.C. 2151.414(E)(1) applies. That section provides:

> **{¶68}** Following the placement of the child outside the child's home and notwithstanding reasonable case planning and diligent efforts by

15

the agency to assist the parents to remedy the problems that initially caused the child to be placed outside the home, the parent has failed continuously and repeatedly to substantially remedy the conditions causing the child to be placed outside the child's home. In determining whether the parents have substantially remedied those conditions, the court shall consider parental utilization of medical, psychiatric, psychological, and other social and rehabilitative services and material resources that were made available to the parents for the purpose of changing parental conduct to allow them to resume and maintain parental duties.

**{¶69}** Under this factor, the trial court found:

**{¶70}** Subsection (E)(1) applies to this case as the agency has offered a plethora of services and means of measuring progress, demonstrating the goal, and showing maintenance of success. The biggest issue is the use of alcohol. Services to address this issue were counseling, random drug screens and AA attendance. But mother did not cooperate. It cannot be said she used the services to achieve, demonstrate and maintain alcohol abstinence especially since she openly says she will use alcohol * * *; she does not submit to random screens at her home; and, she tests positive for alcohol and submits adulterated urine screens.

**{¶71}** Since the trial court found that each of the four factors in R.C. 2151.414(D)(2) applies, the court was required to find that permanent custody is in the best interests of the children and to grant permanent custody. Although the trial court correctly stated that a trial court is not required to apply both best-interest tests in R.C. 2151.414(D)(1) and (D)(2), *H.C., supra*, the court also made the findings required under R.C. 2151.414(D)(1).

**{¶72}** Under (a), the interaction and interrelationships of the children with mother and their foster parents, the court found that the children love their mother and are protective of her, but they are afraid of her when she is drinking and she is not alcohol-free. The children also love their foster parents and their children and are bonded with them.

16

**{¶73}** As for the children's wishes under (b), they have consistently said that they would prefer to return to mother if she is not drinking, but that if she continues drinking, they would prefer to be adopted by the Floyds.

**{¶74}** As for the children's custodial history under (c), the court found, and mother does not dispute, that they were in the agency's custody for more than 12 months of a consecutive 22-month period.

**{¶75}** As for the children's need for a legally secure permanent placement under (d), the court found that a permanent placement requires mother to achieve and maintain an alcohol-free lifestyle and she has not achieved this goal, despite opportunities while the children were in foster care. The children suffer from PTSD, and returning them to mother will not alleviate their fear of her drinking.

**{¶76}** As to whether any of the factors in R.C. 2151.141(E)(7) to (11) apply under (e), the court found the factor in (E)(9) applied. This subsection provides:

**{¶77}** The parent has placed the child at substantial risk of harm two or more times due to alcohol * * * abuse and has rejected treatment two or more times or refused to participate in further treatment two or more times after a case plan issued pursuant to section 2151.412 of the Revised Code requiring treatment of the parent was journalized * * *.

**{¶78}** Under this factor, the trial court found:

**{¶79}** The children were adjudicated twice (in Mahoning and Trumbull Counties), placed into foster care because of the risk of harm, and mother was directed to be alcohol free. She avoids services to detect alcohol, she adulterates her body with creatine to mask the alcohol in her urine, she vows to drink alcohol, and she says she is using because it is legal. She says she attends AA, but gives no information as to the name of her sponsor, and she fails to provide attendance records.

17

{¶80} Contrary to mother's argument, the trial court did not award custody to the agency simply because mother refused to say she is an alcoholic or refused to pledge she would never drink again. Rather, she lost her children because she failed to meet her case plan goals of achieving and maintaining sobriety and addressing her mental health issues. As for the sobriety goal, mother's urine screening and vow to continue drinking once this case is over demonstrated she is not committed to maintaining sobriety. As for her mental health goal, mother did not begin her mental health counseling until July 2016, 14 months after the children were removed from her, and mother continued to exhibit her "manic" behavior, as evidenced by her talking to invisible people and her bizarre behaviors in public (e.g., at L.L.'s talent show and the funeral).

{¶81} Mother's argument that her drinking has not caused the children any harm shows a lack of insight into the effect her drinking and mental health issues have had on them. Mother's drinking was a factor in (1) her attempting to drown C.L. in the bathtub and (2) the removal of her children by Children Services in Mahoning and Trumbull Counties and their placement in foster homes for a total of four and one-half years. Further, mother's mental health was a factor in: (1) her decision to sell all their possessions and have the children walk with her to West Virginia; (2) her repeated talking, arguing, and swearing at invisible people; and (3) her dragging L.L. out of the school auditorium after the principal told mother to leave due to her unruly behavior. These behaviors caused the children great anxiety, fear, psychological harm, and, as to C.L., recurrent nightmares from the drowning incident, and, as to L.L., shame and embarrassment from the talent show incident. In any event, the undisputed fact that the

18

children suffer from post-traumatic stress disorder due to mother's behaviors defeats her argument.

**{¶82}** Next, mother argues that, in granting permanent custody to the agency, the court relied on stale evidence of events that occurred prior to the children being placed in custody in May 2015. However, this argument ignores the evidence of mother's drinking throughout 2016 and up to the trial, her refusal to give a urine screen as late as April 2017 (two months after the trial began), and her repeated vow to continue drinking once this case is over.

**{¶83}** Mother argues that because she accomplished some of her case plan goals, the court's judgment was against the manifest weight of the evidence. However, in granting permanent custody, the trial court obviously believed the witnesses who testified that mother failed to achieve her two most important goals - sobriety and mental health. Significantly, mother does not argue on appeal, let alone point to any evidence, that she achieved these goals.

**{¶84}** We therefore hold the trial court's judgment was not against the manifest weight of the evidence.

**{¶85}** For mother's second and last assigned error, she contends:

**{¶86}** "The appellant's right to due process was violated by the trial court, allowing the agency to draft the decision approving termination of parental rights on their own letterhead without consent of any of the parties or notice as to who was drafting the magistrate's decision, which was the court's decision without any changes whatsoever."

19

{¶87} Mother argues the agency prepared the magistrate's decision, put it on its letterhead, and sent it to the magistrate, who then adopted it without asking mother if she objected to it, thus depriving her of her right to participate in the decision. Mother does not cite any evidence in the record to support this argument, in violation of App.R. 16(A)(7), and for this reason alone, the assigned error lacks merit.

{¶88} Further, since this assignment of error alleges a defect in the magistrate's decision, this issue could have, and thus, pursuant to Juv.R. 40(D)(3)(b)(iv), was required to be, raised in an objection to the magistrate's decision. Since mother failed to do so, it is waived on appeal. *Id.*

{¶89} For the reasons stated in this opinion, the assignments of error lack merit and are overruled. It is the order and judgment of this court that the judgment of the Trumbull County Court of Common Pleas, Juvenile Division, is affirmed.


TIMOTHY P. CANNON, J., concurs,

COLLEEN MARY O'TOOLE, J., dissents.