[Cite as *In re K.L.*, 2021-Ohio-3080.]

# IN THE COURT OF APPEALS OF OHIO
## ELEVENTH APPELLATE DISTRICT
## PORTAGE COUNTY

IN THE MATTER OF:

K.L., DEPENDENT CHILD

CASE NO. 2021-P-0022

Civil Appeal from the
Court of Common Pleas,
Juvenile Division

Trial Court No. 2020 JCF 00647

### O P I N I O N

Decided: September 7, 2021
Judgment: Affirmed

*Judith M. Kowalski*, 333 Babbitt Road, Suite 323, Euclid, OH 44123 (For Appellant).

*Gregory T. Barton*, Assistant Prosecutor, 241 South Chestnut Street, Ravenna, OH 44266 (For Appellee).

*Brian L. Coffman*, 209 South Main Street, Suite 203, Akron, OH 44308 (Guardian ad Litem).

CYNTHIA WESTCOTT RICE, J.

{¶1} Appellant, N.L. ("mother"), appeals from the judgment of the Portage County Court of Common Pleas, Juvenile Division, granting permanent custody of her daughter, K.L., to appellee, the Portage County Department of Job and Family Services ("JFS"). We affirm the judgment of the trial court.

{¶2} K.L., D.O.B. February 5, 2018, was born with a complex heart defect. According to Dr. Gerard Boyle, K.L.'s pediatric cardiologist, the child was born with a

defect referred to as pulmonary atresia; a condition which, in layman's terms, indicates she had only half a heart such that the "blue blood" coming into her heart was ejected backwards into the coronary arteries. The condition is unsustainable for a long period of time and required K.L. to have a heart transplant on August 15, 2018. As a result, K.L. is on highly potent immunosuppressant drugs that she must take twice a day for the rest of her life. These drugs assist suppressing the child's immune system in order to avoid rejecting the transplant. Dr. Boyle stated that while mother and her husband, C.L. ("father") were very attentive to K.L. and her medical issues, he developed concerns regarding K.L.'s post-transplant weight loss and her parents' hygiene. According to the doctor, transplant patients required a pristine living environment to prevent infection. Due to these concerns, JFS was contacted.

{¶3} K.L., along with her brother, L.R.T. were removed from the family home on January 4, 2019.[1] By way of a March 5, 2019 judgment, the children were adjudicated dependent and, several weeks later, temporary custody was awarded to JFS. On October 29, 2020, JFS moved for permanent custody of K.L. The matter proceeded to final hearing on February 3, 2021. At the hearing, the following evidence was adduced:

{¶4} In December 2018, K.L. was diagnosed with a failure to thrive; she was again diagnosed with failure to thrive in January 2019. JFS also had concerns about K.L.'s G-Tube ("feeding tube"), which had fallen out and was not replaced. Jessica Plymale, a JFS caseworker, testified an adjudication hearing was held and on February 21, 2019, K.L. was adjudicated dependent. The case plan required mother and father to

---

1. According to mother, L.R.T. also has multiple medical issues, including hydrocephalous, ADHD, ODD, OCD, post-traumatic stress disorder, kidney problems and acid reflux; according to mother, the child takes six medications a day. On June 24, 2019, L.R.T. was returned to mother's legal custody with an order of protective supervision in favor of JFS.

2

keep a clean home; ensure proper administration of medications; develop an understanding of and effectively utilize feeding equipment; as well as address parenting and mental health concerns (mother admittedly suffered from depression).

{¶5} The family was referred to the Bair Foundation, an organization designed to help families in various states of need, for guidance and assistance in keeping the home clean and addressing parenting matters. According to Ms. Plymale, the parents completed parenting and in-home therapy with Bair.

{¶6} Mother and father began receiving unsupervised visitation with K.L. in January 2020. In April, they started week-long visits, and, in May, the visits progressed to two weeks at a time. Following a visit with the parents in May 2020, K.L.'s foster mother contacted Miranda Lewis, a JFS caseworker assigned to the case from April 2019 to October 2020. According to Ms. Lewis, there were concerns that K.L.'s medication had expired, and her feeding tube had not been properly cleaned. Both parents admitted they failed to check and/or recognize that the medication had expired. When Ms. Lewis left the case, in October 2020, she still had concerns regarding the cleanliness of the home and the parents' ability to properly administer medication. Ms. Lewis recognized that mother was trained to medically administer medication; still, however, she was unaware of any formal certification mother received regarding administering medication.

{¶7} Ms. Plymale was assigned as caseworker in October 2020. Ms. Plymale noted that K.L. has a bond with her parents, brother, and her foster family. Ms. Plymale testified that the parents attended nearly all of their visits with K.L., only absent when someone was sick. Ms. Plymale visited the parents' home in November 2020 and took photographs during the visit. She found the home in disarray, with trash and old food in

3

various places throughout the residence. She advised mother and father of her concerns regarding the cleanliness of the home. Ms. Plymale also advised the parents they could contact the Bair Foundation to address this issue and perhaps establish a cleaning schedule. Two weeks later, on November 24, Ms. Plymale revisited the home, but found the home in substantially the same condition. She noted, however, that some progress had occurred in that a large trash can had been removed from the living room and mother and father purchased a Roomba.

{¶8} On December 15, 2020, Ms. Plymale visited the home to evaluate the parents' progress. She was informed that L.R.T., K.L.'s brother, was ill, so the parties rescheduled a virtual visit for December 31, 2020. Ms. Plymale sent mother the link for the visit, but mother did not appear. Later, on January 13, 2021 and January 22, 2021, Ms. Plymale visited the home. She heard L.R.T. inside the home and, on each occasion, the parents' vehicles were in the driveway. No one, however, answered the door.

{¶9} Notwithstanding the foregoing, Ms. Plymale conceded the parents completed parenting classes and mother continues to engage in individual counseling; further, the parents' case record indicated the parents had been trained on administering K.L.'s feeding tube and medication.

{¶10} Father acknowledged the case plan goals and further recognized the importance of cleanliness in the home. He observed he and mother had been working on improving the home for K.L.'s return. He additionally stated neither he nor mother would ever deny the caseworkers access to their home. Also, while he conceded he had not realized K.L.'s medication had expired in May 2020, he asserted that neither he nor mother were made responsible for filling the prescriptions; indeed, he stated that, even if

4

he and mother recognized the medication had been expired, they were unable order new or additional medication. Instead, he claimed the foster mother, a registered nurse, was obligated to obtain the medications.

{¶11} Mother testified she was twice medically certified to administer K.L.'s medication: once in October 2018 and then in September 2020. She claimed the certifications were initially necessary for K.L.'s release from rehab. Mother additionally stated that the expired-medication problem took place over Memorial Day weekend and that neither she nor father had any authorization to renew the prescription. She also pointed out that the foster mother did not caution her before the two-week visit that the medication would expire during the visit. Still, however, mother conceded she did not independently recognize the medication's expiration.

{¶12} Regarding Ms. Plymale's unannounced visits, mother stated she was not in the home often during this timeframe because she was assisting a friend attend to a diabetic child. Mother contended that, had she known Ms. Plymale intended to visit, she would have "gladly let her in." Further, regarding the cleanliness of the home, mother noted that she and father separated at one point and, during this period, the home was unclean.

{¶13} Mother asserted she has a "medical poster" with K.L.'s feeding schedule and all K.L.'s medications are organized in a dresser drawer. Mother claimed that JFS had been vague regarding its expectations for her and father, and communications were not ideal; to wit, the family had three caseworkers since the case's inception.

{¶14} Brian Coffman, K.L.'s guardian ad litem ("GAL"), stated that, even though mother and father loved K.L., their difficulties tending to her serious medical problems,

5

including maintaining an adequately clean home, necessitated a recommendation that permanent custody be awarded to JFS. And, on February 28, 2021, the trial court entered judgment granting permanent custody in JFS' favor.

{¶15} Mother now appeals and assigns three errors for our review. Her first assigned error alleges:

{¶16} "The trial court erred to the prejudice of the appellant and against the best interest of the child when it denied a continuance for the appellant-mother, depriving her of her right to due process and abusing its discretion, as the mother's attorney informed the court she had issues with serving subpoenas on three defense witnesses, and due to the denial of continuance mother was unable to present two of those witnesses."

{¶17} "'The grant or denial of a continuance is a matter that is entrusted to the broad, sound discretion of the trial judge.'" *DePizzo v. Stabile,* 11th Dist. Trumbull No. 2006-T-0027, 2006-Ohio-6102, ¶7, quoting *State v. Unger,* 67 Ohio St.2d 65, paragraph one of the syllabus (1981). An appellate court will not interfere unless there was a clear abuse of discretion. *DePizzo* at ¶7. An abuse of discretion is the trial court's ""'failure to exercise sound, reasonable, and legal decision-making.'"" *Hammonds v. Eggett,* 11th Dist. Geauga No. 2010-G-2980, 2011-Ohio-6510, ¶16, quoting *State v. Beechler,* 2d Dist. Clark No. 09-CA-54, 2010-Ohio-1900, ¶62, quoting Black's Law Dictionary (8 Ed.Rev.2004) 11. "'There are no mechanical tests for deciding when a denial of a continuance is so arbitrary as to violate due process. The answer must be found in the circumstances present in every case, particularly in the reasons presented to the trial judge at the time the request is denied.'" *DePizzo* at ¶8, quoting *Unger, supra*, at 67.

6

{¶18} At the commencement of the hearing, counsel for mother sought a continuance "based on service issues that we had regarding subpoenas for my client and COVID and things like that within the past 30 days." Counsel represented that, without a continuance, mother would be unable to call three witnesses in her defense. The court denied the request, stating on record:

> {¶19} Okay I would indicate for the record that I will deny the continuance. This matter has been kicked a couple of times. I think that finality for the child is essential and in the child's best interest. Not only that, I have no - - in the case file I have no record of a written continuance being filed prior to the hearing. I have no record of request for subpoenas or subpoenas filed in the court file prior to the hearing, and therefore I'll deny your continuance and we'll proceed then.

{¶20} Initially, mother's counsel did not identify any of the purported witnesses or attempt to proffer the substance of what their testimony would demonstrate. "The purpose of a proffer is to assist the reviewing court in determining, pursuant to Evid.R. 103, whether the trial court's exclusion of evidence affected a substantial right of the appellant." *In re Walker*, 162 Ohio App.3d 303, 2005-Ohio-3773, ¶37 (11th Dist.). This court has concluded that when a continuance is requested to secure a witness' attendance, the failure to proffer the substance of the anticipated testimony waives or forfeits any error. *In re Maciulewicz*, 11th Dist. Ashtabula No. 2002-A-0046, 2002-Ohio-4820, ¶33. Further, even if the doctrine waiver or forfeiture does not operate to prevent appellate review, it is still not possible to evaluate whether the denial of request for continuance prejudiced a party's due process rights. *In re K.M.*, 11th Dist. Trumbull No. 2017-T-0059, 2017-Ohio-8286, ¶29. (When a party fails to proffer testimony which is allegedly critical to her case, any prejudice is, at best, speculative.)

7

{¶21} We also note that various witnesses for JFS testified that the parents' home was never adequately clean such that it could suit K.L.'s medical needs. Mother also conceded at the hearing that, after the parents lost unsupervised visitation in May 2020, the home was unclean throughout the summer due to her absence; and, she also admitted that the home becomes unclean when she feels "overwhelmed" or falls into depression – situations that could arguably occur at any time and with repetition. The home's unclean character was a primary basis for the trial court's award of permanent custody to JFS. In light of these points and concessions, it is difficult to imagine how any witness for mother (or the parents) could have changed the trial court's perception regarding the child's best interests. Regardless, without some basic idea of who the potential witnesses were, what their relationship to the family, or at least to the mother, was, and what their anticipated testimony might show, we cannot conclude the trial court's denial of the continuance was an unreasonable or unfair exercise of sound legal decision making.

{¶22} Moreover, even though counsel represented she had difficulty subpoenaing the witnesses at issue, the record does not include any formal subpoenas filed by mother's counsel. To the contrary, the only subpoenas that were filed after counsel's appointment were issued by the assistant prosecutor. And, although several subpoenas were issued by mother's previous counsel, those were filed *prior to* the court's granting two continuances of the final hearing. Those subpoenas were not re-issued for those witnesses to appear at the re-scheduled date of the final hearing. Under the circumstances, we discern no abuse of discretion.

{¶23} Mother's first assignment of error lacks merit.

8

{¶24} For her second assignment of error, mother asserts:

{¶25} "The Portage County Juvenile Court erred and abused its discretion in finding that clear and convincing evidence supported granting permanent custody of the subject child to the Portage County Department of Child and Family Services." (Sic.)

{¶26} Mother argues that the trial court's decision to grant permanent custody to JFS was not supported by the evidence because she had made progress and was still progressing on her case plan.

{¶27} "'A reviewing court generally will not disturb a trial court's permanent custody decision unless the decision is against the manifest weight of the evidence.'" *In re N.M.P.,* 11th Dist. Portage No. 2018-P-0056, 2018-Ohio-5072, ¶54, quoting *In re D.M.,* 4th Dist. Hocking No. 15CA22, 2016-Ohio-1450, ¶10. "[A]n appellate court will not reverse a judgment as being contrary to the weight of the evidence as long as there is some competent, credible evidence supporting the judgment." *In re Kangas*, 11th Dist. Ashtabula No. 2006-A-0084, 2007-Ohio-1921, ¶81. The manifest-weight standard of review is the same in a civil case as in a criminal case. *Eastley v. Volkman*, 132 Ohio St.3d 328, 2012-Ohio-2179, ¶17.

{¶28} When applying the manifest-weight standard of review, the reviewing court reviews the entire record, "'weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the [finder of fact] clearly lost its way and created such a manifest miscarriage of justice that the [judgment] must be reversed and a new trial ordered.'" *Eastley, supra*, ¶20, quoting *Tewarson v. Simon*, 141 Ohio App.3d 103, 115, (9th Dist.2001). "The finder of

9

fact is entitled to believe all, part, or none of the testimony of any witness." *River Oaks Homes, Inc. v. Twin Vinyl, Inc.*, 11th Dist. Lake No. 2007-L-117, 2008-Ohio-4301, ¶27.

{¶29} "Under the manifest weight standard of review, we are 'guided by a presumption' that the fact-finder's findings are correct." *Terry v. Kellstone, Inc.*, 6th Dist. Erie No. E-12-061, 2013-Ohio-4419, ¶13, citing *Seasons Coal Co. v. Cleveland*, 10 Ohio St.3d 77, 79-80 (1984). *See also Eastley* at ¶21. We must make "'every reasonable presumption * * * in favor of the judgment and the finding of facts.'" *Id.*, quoting *Seasons Coal Co.* at 80, fn. 3. "'If the evidence is susceptible of more than one construction,'" we are "'bound to give it that interpretation which is consistent with the * * * judgment [and] most favorable to sustaining the * * * judgment.'" *Eastley, supra,* quoting *Seasons Coal Co., supra*.

{¶30} Before a juvenile court may terminate parental rights and award permanent custody of a child to a proper moving agency, it must find clear and convincing evidence of both prongs of the permanent custody test: (1) that the child is abandoned; orphaned; has been in the temporary custody of the agency for at least 12 months of a consecutive 22-month period; the child or another child of the same parent has been adjudicated abused, neglected, or dependent three times; or that the child cannot be placed with either parent, based on an analysis under R.C. 2151.414(E); and (2) that the grant of permanent custody to the agency is in the best interest of the child, based on an analysis under R.C. 2151.414(D)(1). R.C. 2151.414(B)(1) and 2151.414(B)(2); *see also In re William S.,* 75 Ohio St.3d 95, 98-99 (1996).

{¶31} "Clear and convincing evidence" is evidence sufficient to "produce in the mind of the trier of fact a firm belief or conviction as to the facts sought to be

10

established." *In re K.H.*, 119 Ohio St.3d 538, 2008-Ohio-4825, ¶42. We will not substitute our judgment for that of the trial court applying a clear-and-convincing standard where there is ample competent and credible evidence supporting the trial court's determination. *See In re A.J.O. and M.N.O.*, 1st Dist. Hamilton No. C-180680, 2019-Ohio-975, ¶6.

{¶32} In granting JFS' motion for permanent custody, the trial court made the following findings:

{¶33} "A.) K.L. was in the Temporary Custody of PCDJFS for more than 12 months in a 22 consecutive month period * * *;

{¶34} B.) K.L. cannot be placed with either of her parents within a reasonable time and should not be placed with her parents;

{¶35} C.) Permanent custody is in the child's best interest;

{¶36} D.) That K.L.'s parents [mother] and [father] did not complete their case plan because their home was unsuitable, was a threat to K.L.'s safety and health, was never clean or suitable for any consistent period of time. K.L. cannot reside safely in her parents' home without fear of infection and the parents' home is not safe and secure;

{¶37} E.) The Court considered all relevant factors of R.C. 2151.43 in determining best interest of K.L.;

{¶38} F.) The parents have repeatedly failed to remedy the clutter, cleanliness and exposed food products in the home which can and will likely cause infection to K.L., a medically fragile child, which may lead to her physical harm, her serious physical harm or her death. Cleanliness of the home which could lead to infection for K.L. has been a

Case No. 2021-P-0022

continuing issue since 2018 (with short breaks) until the date of the hearing on February 3, 2021;

{¶39} G.) Services were offered to the parents thru [sic] Cleveland Clinic, Bair Foundation and Social Workers, yet the cleanliness issue continued;

{¶40} H.) K.L.'s parents have failed, for whatever reason to protect her from infection and serious physical harm. That K.L.'s parents are unwilling and/or unable to provide a safe and secure home for K.L. given her fragile condition;

{¶41} I.) K.L.'s Guardian Ad-litem recommends permanent custody of K.L. to PCDJFS;

{¶42} J.) K.L needs legally secure placement which cannot occur unless PCDJFS is granted permanent custody;

{¶43} K.) Reunification with K.L.'s parents is unlikely due to time constraints and their failure to provide a clean and suitable home for K.L.;

{¶44} L.) The child cannot express an opinion;

{¶45} M.) Following the placement of the child outside the child's home and notwithstanding reasonable case planning and diligent efforts by the agency to assist mother and father to remedy the problems that initially caused the child to be placed outside the home, mother and father have failed continuously and repeatedly to substantially remedy the conditions (clean and stable home) causing the child to be placed outside the child's home;

{¶46} N.) Portage County Department of Job and Family Services has made reasonable efforts in preventing the continued removal of the child from her home or to make it possible to return the child home;

12

{¶47} O.) There are no relatives or person who have been located or qualified that have shown an interest to be a relative placement or legal custodian.

{¶48} Mother maintains the totality of the foregoing findings did not clearly and convincingly warrant the trial court's award of permanent custody to JFS. As such, she contends the trial court's judgment is against the manifest weight of the evidence. Specifically, mother asserts she completed parenting classes and was trained in the administration of K.L.'s medication. And, while there was evidence the court accepted that the parents administered expired medication, mother emphasizes K.L., at that time, suffered no harm. Mother additionally points out that it was the foster mother's obligation to provide the medication.

{¶49} Regarding the issue of cleanliness, mother argues K.L. was not in the home on November 10 and 24, 2020 when the photographs that were admitted into evidence were taken. Mother further notes that she had left the home for a period of time and her absence significantly contributed to the uncleanliness. Moreover, mother points out that even though Dr Boyle advised K.L. must live in a "pristine" home environment, no one, including the doctor, was able to define what such a condition required.

{¶50} With due respect to mother's arguments, Jennifer Waicak, mother's therapist with the Bair Foundation, testified that mother knew and understood what was expected of her regarding the condition of the home. Ms. Waicak asserted that Ms. Lewis, mother's caseworker until October 2020, procured a letter from K.L.'s physician regarding what was needed and mother "verbalized that she was already aware of it, and she basically verbatim gave me what the letter said." Still, between August and December 2020, Ms. Waicak visited the home some 12 times and observed that it was clean

13

sometimes, but other times it was not. And, Ms. Waicak agreed that there was no obvious period of time where the home was in a sustained state of cleanliness.

{¶51} Furthermore, Ms. Lewis noted that she attempted to visit the parents' residence multiple times over the summer of 2020. And, although the parents were ostensibly separated during this time, she was unable to gain access. Still, Ms. Lewis asserted that, through the front door, she observed the home in a state of disarray. Mother acknowledged the home can become messy, but "[w]hen the house gets like that it's due to being overwhelmed with things that are going on around me and my depression will set in * * *." Even though K.L. was not residing in the home during the summer and fall months of 2020, the foregoing evidence demonstrates that mother is either unable or unwilling to establish a consistent, suitable environment for K.L. to thrive safely in light of her medical fragility.

{¶52} To the last point, mother's assertion that K.L. was not residing with the parents at the time when the photos were taken in November of 2020 is of little moment. The photos, which were admitted into evidence, depict a home, at best, in complete disarray. They show: garbage (some bagged, some not) and food bestrewn throughout the house; significant amassments of clutter piled in nearly every room and, in some cases, blocking entries and egresses; filthy furniture; a kitchen that is heaped with dirty dishes and an abundance of other, non-descript rubbish; a bathroom with, what appears to be an unflushed commode; and a vehicle littered with food items, used fast-food containers, and other cast-off debris. Regardless of whether K.L. was not in the home at the time, the photos reflect the parents' "default" living conditions, and the court was free to conclude that these conditions would not significantly change (especially given JFS'

14

and Bair Foundation's interventions and advice regarding the issue of cleanliness) if K.L., in her medically fragile condition, were returned.

{¶53} Additionally, mother's admission that her depression, which is apparently ongoing, (as well as the potentially tumultuous nature of the parents' personal relationship) fundamentally affects whether the home is adequately clean or unacceptably dirty, there is no reasonable basis to conclude the home will ever be sufficiently clean to meet K.L.'s heightened needs. These points are compounded by mother's testimony that L.R.T. is medically compromised and on six different medications daily. If mother is psychologically strained and must administer L.R.T.'s various medications, the difficulties inherent in keeping a consistently clean home *and* administering all the medications to each child are manifest.

{¶54} Moreover, although the court did not place heavy emphasis on the episode during which the parents administered expired medication to K.L., mother's admission that she was unaware it was expired and did not check the expiration also militates against her case. While the oversight was not intentional, her recognition that she did not check the expiration date was, at the least, unreasonable given K.L.'s extremely vulnerable medical condition. The same observation would apply to K.L.'s unclean feeding tube, which she had when she was returned from a visit with the parents in May 2020.

{¶55} In addition, the trial court overtly noted the GAL's recommendation. In recommending permanent custody to JFS, the GAL noted that the case commenced when K.L. was in need of a heart transplant and the parents were provided housing through the Cleveland Clinic at the Ronald McDonald House. And, due to the unsanitary

15

nature of their living conditions, they were asked to leave. The GAL underscored that K.L. will have a lifetime of being immunocompromised and he expressed his concern that, even though the parents provided her with expired medications only once, the same error could occur again. And, in relation to this point, the GAL pointed out that, in administering the expired medication, he is worried that the parents do not fully understand the importance of monitoring the expiration date. The GAL stated that the Bair Foundation made unannounced visits on a monthly basis to the home and continued to find it unsanitary and unacceptable for K.L.'s needs. The GAL asserted his belief that JFS had done all it could to help the parents understand the import of K.L.'s serious medical condition and the importance of keeping the living space extremely clean, but they have repeatedly failed to heed the advice and directives. As a result, the GAL recommended permanent custody to JFS.

{¶56} Given the foregoing, we conclude that, due to the severity of K.L.'s condition, which indisputably demands an extremely clean, if not immaculate, living environment as well as vigilant attentiveness to feeding and medication, there was clear and convincing evidence that awarding permanent custody to JFS was in the child's best interest.

{¶57} A final point requires attention. Mother notes that Dr. Boyle offered an unsolicited statement during his testimony regarding his view that he feels responsible, not only to K.L., but also to the family of her heart donor. Mother contends this statement was highly prejudicial. Although not entirely clear, mother seems to claim that the doctor's statement was an appeal to the court's emotions which could reasonably, albeit subconsciously, taint the court's perception regarding K.L.'s best interest. Initially, we

16

fail to see how the doctor's observation regarding his personal and/or professional obligations to his patients would somehow bias the trial court's assessment of the evidence. Further, even if the statement could be perceived as somehow inflammatory, evidence that might inflame the passions of a jury do not necessarily have the same effect on a judge. *State v. White*, 15 Ohio St.2d 146, 151 (1968). Rather, it is presumed that, in a bench trial, "the court considered only relevant, material, and competent evidence in arriving at its judgment unless it affirmatively appears to the contrary." *Id.* Here, the court summarized Dr. Boyle's testimony in its judgment entry; it did not refer to the statement at issue. Hence, there is nothing to suggest the comment was considered in the court's analyses and conclusions.

{¶58} Mother's second assignment of error lacks merit.

{¶59} Mother's third assigned error provides:

{¶60} "The Portage County Juvenile Court erred in finding that permanent custody was in the best interests of the child when, when the guardian ad litem failed to file a written report and his oral recommendation was based solely on a document issued by the agency."

{¶61} Under her final assignment of error, mother asserts that the trial court plainly erred in granting permanent custody to JFS because the GAL failed to file a written report in accordance with the Ohio Rules of Superintendence. She also complains that, during the oral recommendation at the hearing, the GAL referenced a semiannual administrative review.

{¶62} Initially, mother did not object to the lack of a written report prior to the GAL issuing his oral recommendation. As a result, she has forfeited all but plain error. "To

17

constitute plain error the alleged error must have substantially affected the outcome such that but for the error, the outcome would have been otherwise." *In re C.H.*, 11th Dist. Ashtabula No. 2018-A-0061, 2019-Ohio-4316, ¶24.

{¶63} In support of her claim of plain error, mother points to former Sup.R. 48(F)(1)(c), which provided that in actions to terminate parental rights, "[u]nless waived by all parties or the due date is extended by the court, the final report shall be filed with the court and made available to all parties for inspection no less than seven days before the dispositional hearing." Current Sup.R. 48.06(B)(1) provides a similar provision; to wit: "[a] guardian ad litem in * * * actions to terminate parental rights shall provide a written report to the court, unrepresented parties, and legal counsel not less than seven days prior to any * * * permanent custody hearing * * *." Notwithstanding this provision, this rule does not give rise to substantive rights. *In re K.V.*, 6th Dist. Lucas No. L-11-1087, 2012-Ohio-190, ¶27; *accord In re B.K.*, 12th Dist. Butler No. CA2010-12-324, 2011-Ohio-4470; *In re D.C.J.*, 8th Dist. Cuyahoga Nos. 97681, and 97776, 2012-Ohio-4154. Indeed, this court has held that "[t]he Rules of Superintendence are viewed as internal housekeeping rules which do not have the force or effect of procedural rules or statutes; accordingly, violations do not warrant reversal of a decision." *In re C.H.*, *supra*, at ¶39, citing *Allen v. Allen*, 11th Dist. Trumbull No. 2009-T-0070, 2010-Ohio-475, ¶31. Accordingly, the failure to comply with the Rules of Superintendence, even if a technical error, is not reversible.

{¶64} Moreover, it is worth pointing out that mother's counsel had the opportunity to cross-examine the GAL but did not do so. In many cases, the failure to file a written report may be problematic because a parent's counsel may be unaware, or at least unable

18

to anticipate, either the recommendation or its rationale. Because no objection was filed, one could infer that counsel was aware of the GAL's position and cross-examination may have only reinforced the evidence which did not help her position. After all, throughout the hearing there was ample evidence which supported or corroborated the rationale supporting GAL's oral recommendation. Thus, even had the GAL filed a written report, we fail to see how the outcome would have been different. In this respect, we fail to find plain error. *See In re L.S.*, 8th Dist. Cuyahoga No. 108666, 2019-Ohio-5347, ¶17; *see, also, In re R.C.*, 8th Dist. Cuyahoga No. 82453, 2003-Ohio-7062, ¶ 22 ("An award of permanent custody will not be disturbed where the guardian ad litem failed to issue a written report and no objection was offered at the hearing.")

{¶65} Finally, mother contends the GAL relied solely on an agency report in making his recommendation. The record demonstrates, however, that the GAL referenced team meetings, meetings with the parents, and the testimony at the hearing. Mere reference to a JFS' record document does not mean the GAL's recommendation was plagiarized or reflected only the points illustrated in that document. Again, we decline to find plain error due to this reference.

{¶66} Despite the foregoing legal analysis, we are dismayed by the GAL's failure to file a written report with the court. The recommendation, which was entered at the end of the hearing, did not indicate, with any depth, the nature of the GAL's interaction with the parents during the time the case was open. The GAL failed to assert how often, if at all, he visited the family home and, not coincidentally, he did not comment on his own, first-hand perception of the home's condition. In effect, the GAL's recommendation was based upon a recitation of evidence previously given by prior witnesses *at the hearing*.

19

We must emphasize that, without an objection, we cannot find reversible error. Nevertheless, we do find the GAL's performance was sub-par and the parties and the court would have benefitted from a significantly more detailed rendition of GAL's involvement in the case. A task generally accomplished by the timely filing of a written GAL report.

{¶67} Mother's third assignment of error lacks merit.

{¶68} For the reasons discussed in this opinion, the judgment of the Portage County Court of Common Pleas, Juvenile Division, is affirmed.

MARY JANE TRAPP, P.J.,

THOMAS R. WRIGHT, J.,

concur.

Case No. 2021-P-0022