[Cite as *In re K.L.*, 2021-Ohio-3079.]

# IN THE COURT OF APPEALS OF OHIO
## ELEVENTH APPELLATE DISTRICT
## PORTAGE COUNTY

IN THE MATTER OF:

K.L., DEPENDENT CHILD

CASE NO. 2021-P-0021

Civil Appeal from the
Court of Common Pleas,
Juvenile Division

Trial Court No. 2020 JCF 00647

**O P I N I O N**

Decided: September 7, 2021
Judgment: Affirmed

*Joseph F. Salzgeber*, P.O. Box 799, Brunswick, OH 44212 (For Appellant).

*Gregory T. Barton,* Assistant Prosecutor, 241 South Chestnut Street, Ravenna, OH 44266 (For Appellee).

*Brian L. Coffman*, 209 South Main Street, Suite 203, Akron, OH 44308 (Guardian ad Litem).

CYNTHIA WESTCOTT RICE, J.

{¶1} Appellant, C.L. ("father"), appeals from the judgment of the Portage County Court of Common Pleas, Juvenile Division, granting permanent custody of his daughter, K.L., to appellee, the Portage County Department of Job and Family Services ("JFS"). We affirm the judgment of the trial court.

{¶2} K.L., D.O.B. February 5, 2018, was born with a complex heart defect. According to Dr. Gerard Boyle, K.L.'s pediatric cardiologist, the child was born with a

defect referred to as pulmonary atresia; a condition which, in layman's terms, indicates she had only half a heart such that the "blue blood" coming into her heart was ejected backwards into the coronary arteries. The condition is unsustainable for a long period of time and required K.L. to have a heart transplant on August 15, 2018. As a result, K.L. is on highly potent immunosuppressant drugs that she must take twice a day for the rest of her life. These drugs assist suppressing the child's immune system in order to avoid rejecting the transplant. Dr. Boyle stated that while N.L. ("mother") and father were very attentive to K.L. and her medical issues, he developed concerns regarding K.L.'s post-transplant weight loss and her parents' hygiene. According to the doctor, transplant patients required a pristine living environment to prevent infection. Due to these concerns, JFS was contacted.

{¶3} K.L., along with her brother, L.R.T. were removed from the family home on January 4, 2019.[1] By way of a March 5, 2019 judgment, the children were adjudicated dependent and, several weeks later, temporary custody was awarded to JFS. On October 29, 2020, JFS moved for permanent custody of K.L. The matter proceeded to final hearing on February 3, 2021. At the hearing, the following evidence was adduced:

{¶4} In December 2018, K.L. was diagnosed with a failure to thrive; she was again diagnosed with failure to thrive in January 2019. JFS also had concerns about K.L.'s G-Tube ("feeding tube"), which had fallen out and was not replaced. Jessica Plymale, a JFS caseworker, testified an adjudication hearing was held and on February 21, 2019, K.L. was adjudicated dependent. The case plan required mother and father to

---

1. According to mother, L.R.T. also has multiple medical issues, including hydrocephalous, ADHD, ODD, OCD, post-traumatic stress disorder, kidney problems and acid reflux; according to mother, the child takes six medications a day. On June 24, 2019, L.R.T. was returned to mother's legal custody with an order of protective supervision in favor of JFS.

2

keep a clean home; ensure proper administration of medications; develop an understanding of and effectively utilize feeding equipment; as well as addressing parenting and mental health concerns (mother admittedly suffered from depression).

{¶5} The family was referred to the Bair Foundation, an organization designed to help families in various states of need, for guidance and assistance in keeping the home clean and addressing parenting matters. According to Ms. Plymale, the parents completed parenting and in-home therapy with Bair.

{¶6} Mother and father began receiving unsupervised visitation with K.L. in January 2020. In April, they started week-long visits and, in May, the visits progressed to two weeks at a time. Following a visit with the parents in May 2020, K.L.'s foster mother contacted Miranda Lewis, a JFS caseworker assigned to the case from April 2019 to October 2020. According to Ms. Lewis, there were concerns that K.L.'s medication had expired, and her feeding tube had not been properly cleaned. Both parents admitted they failed to check and/or recognize that the medication had expired. When Ms. Lewis left the case, in October 2020, she still had concerns regarding the cleanliness of the home and the parents' ability to properly administer medication. Ms. Lewis recognized that mother was trained to medically administer medication; still, however, she was unaware of any formal certification mother received regarding administering medication.

{¶7} Ms. Plymale was assigned as caseworker in October 2020. Ms. Plymale noted that K.L. has a bond with her parents, brother, L.R.T., and her foster family. Ms. Plymale testified that the parents attended nearly all of their visits with K.L., only absent when someone in the family was sick. Ms. Plymale visited the parents' home in November 2020 and took photographs during the visit. She found the home in disarray, with trash and old food in various places throughout the residence. She advised mother

3

and father of her concerns regarding the cleanliness of the home. Ms. Plymale also advised the parents they could contact the Bair Foundation to address this issue and perhaps establish a cleaning schedule. Two weeks later, on November 24, Ms. Plymale revisited the home, but found the home in substantially the same condition. She noted, however, that some progress had occurred in that a large trash can had been removed from the living room, and mother and father purchased a Roomba.

{¶8} On December 15, 2020, Ms. Plymale visited the home to evaluate the parents' progress. She was informed that L.R.T. was ill, so the parties rescheduled a virtual visit for December 31, 2020. Ms. Plymale sent mother the link for the visit, but mother did not appear. Later, on January 13, 2021 and January 22, 2021, Ms. Plymale visited the home. She heard L.R.T. inside the home and, on each occasion, the parents' vehicles were in the driveway. No one, however, answered the door.

{¶9} Notwithstanding the foregoing, Ms. Plymale conceded the parents completed parenting classes and mother continues to engage in individual counseling; further, the parents' case record indicated the parents had been trained on administering K.L.'s feeding tube and medication.

{¶10} Father acknowledged the case plan goals and further recognized the importance of cleanliness in the home. Father observed he and mother had been working on improving the home for K.L.'s return. He additionally stated neither he nor mother would ever deny the caseworkers access to their home. Also, while he conceded he had not realized K.L.'s medication had expired in May 2020, he asserted that neither he nor mother were made responsible for filling the prescriptions; indeed, he stated that, even if he and mother recognized the medication had been expired, they were unable order new

4

or additional medication. Instead, he claimed the foster mother, a registered nurse, was obligated to obtain the medications.

{¶11} Mother testified she was twice medically certified to administer K.L.'s medication: once in October 2018 and then in September 2020. She claimed the certifications were initially necessary for K.L.'s release from rehab. Mother additionally stated that the expired-medication problem took place over Memorial Day weekend and that neither she nor father had any authorization to renew the prescription. She also pointed out that the foster mother did not caution her before the two-week visit that the medication would expire during the visit. Still, however, mother conceded she did not independently recognize the medication's expiration.

{¶12} Regarding Ms. Plymale's unannounced visits, mother stated she was not in the home often during this timeframe because she was assisting a friend attend to a diabetic child. Mother contended that, had she known Ms. Plymale intended to visit, she would have "gladly let her in." Further, regarding the cleanliness of the home, mother noted that she and father separated at one point and, during this period, the home was unclean.

{¶13} Mother asserted she has a "medical poster" with K.L.'s feeding schedule and all K.L.'s medications are organized in a dresser drawer. Mother claimed that JFS had been vague regarding its expectations for her and father, and communications were not ideal; to wit, the family had three caseworkers since the case's inception.

{¶14} Brian Coffman, K.L.'s guardian ad litem ("GAL"), stated that, even though mother and father loved K.L., their difficulties tending to her serious medical problems, including maintaining an adequately clean home, necessitated a recommendation that

5

permanent custody be awarded to JFS. And, on February 28, 2021, the trial court entered judgment granting permanent custody in JFS' favor.

{¶15} Father now appeals and assigns the following as error:

{¶16} "The trial court erred and abused its discretion by terminating father's parental rights and granting permanent custody of the child, K.L., to the Portage County Department of Job and Family Services (PCDJFS), instead of granting legal custody of the child, K.L., [to] father and mother."

{¶17} Father asserts that the trial court erred in granting JFS permanent custody because JFS failed to establish that such a decision was in K.L.'s best interests. He maintains he and mother complied with their case plans and the only remaining matter that required attention was a consistently clean home.

{¶18} "'A reviewing court generally will not disturb a trial court's permanent custody decision unless the decision is against the manifest weight of the evidence.'" *In re N.M.P.,* 11th Dist. Portage No. 2018-P-0056, 2018-Ohio-5072, ¶54, quoting *In re D.M.,* 4th Dist. Hocking No. 15CA22, 2016-Ohio-1450, ¶10. "[A]n appellate court will not reverse a judgment as being contrary to the weight of the evidence as long as there is some competent, credible evidence supporting the judgment." *In re Kangas*, 11th Dist. Ashtabula No. 2006-A-0084, 2007-Ohio-1921, ¶81. The manifest-weight standard of review is the same in a civil case as in a criminal case. *Eastley v. Volkman*, 132 Ohio St.3d 328, 2012-Ohio-2179, ¶17.

{¶19} When applying the manifest-weight standard of review, the reviewing court reviews the entire record, "'weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the [finder of fact] clearly lost its way and created such a manifest miscarriage of justice

6

that the [judgment] must be reversed and a new trial ordered.'" *Eastley, supra*, ¶20, quoting *Tewarson v. Simon*, 141 Ohio App.3d 103, 115, (9th Dist.2001). "The finder of fact is entitled to believe all, part, or none of the testimony of any witness." *River Oaks Homes, Inc. v. Twin Vinyl, Inc.*, 11th Dist. Lake No. 2007-L-117, 2008-Ohio-4301, ¶27.

{¶20} "Under the manifest weight standard of review, we are 'guided by a presumption' that the fact-finder's findings are correct." *Terry v. Kellstone, Inc.*, 6th Dist. Erie No. E-12-061, 2013-Ohio-4419, ¶13, citing *Seasons Coal Co. v. Cleveland*, 10 Ohio St.3d 77, 79-80 (1984). *See also Eastley* at ¶21. We must make "'every reasonable presumption * * * in favor of the judgment and the finding of facts.'" *Id.*, quoting *Seasons Coal Co.* at 80, fn. 3. "'If the evidence is susceptible of more than one construction,'" we are "'bound to give it that interpretation which is consistent with the * * * judgment [and] most favorable to sustaining the * * * judgment.'" *Eastley, supra,* quoting *Seasons Coal Co., supra*.

{¶21} Before a juvenile court may terminate parental rights and award permanent custody of a child to a proper moving agency, it must find clear and convincing evidence of both prongs of the permanent custody test: (1) that the child is abandoned; orphaned; has been in the temporary custody of the agency for at least 12 months of a consecutive 22-month period; the child or another child of the same parent has been adjudicated abused, neglected, or dependent three times; or that the child cannot be placed with either parent, based on an analysis under R.C. 2151.414(E); and (2) that the grant of permanent custody to the agency is in the best interest of the child, based on an analysis under R.C. 2151.414(D)(1). R.C. 2151.414(B)(1) and 2151.414(B)(2); *see also In re William S.*, 75 Ohio St.3d 95, 98-99 (1996).

7

{¶22} "Clear and convincing evidence" is evidence sufficient to "produce in the mind of the trier of fact a firm belief or conviction as to the facts sought to be established." *In re K.H.*, 119 Ohio St.3d 538, 2008-Ohio-4825, ¶42. We will not substitute our judgment for that of the trial court applying a clear-and-convincing standard where there is ample competent and credible evidence supporting the trial court's determination. *See In re A.J.O. and M.N.O.*, 1st Dist. Hamilton No. C-180680, 2019-Ohio-975, ¶6.

{¶23} In granting JFS' motion for permanent custody, the trial court made the following findings:

{¶24} A.) K.L. was in the Temporary Custody of PCDJFS for more than 12 months in a 22 consecutive month period * * *;

{¶25} B.) K.L. cannot be placed with either of her parents within a reasonable time and should not be placed with her parents;

{¶26} C.) Permanent custody is in the child's best interest;

{¶27} D.) That K.L.'s parents [mother] and [father] did not complete their case plan because their home was unsuitable, was a threat to K.L.'s safety and health, was never clean or suitable for any consistent period of time. K.L. cannot reside safely in her parents' home without fear of infection and the parents' home is not safe and secure;

{¶28} E.) The Court considered all relevant factors of R.C. 2151.43 in determining best interest of K.L.;

{¶29} F.) The parents have repeatedly failed to remedy the clutter, cleanliness and exposed food products in the home which can and will likely cause infection to K.L., a medically fragile child, which may lead to her physical harm, her serious physical harm or her death. Cleanliness of the home which could lead to infection for K.L. has been a

8

continuing issue since 2018 (with short breaks) until the date of the hearing on February 3, 2021;

{¶30} G.) Services were offered to the parents thru [sic] Cleveland Clinic, Bair Foundation and Social Workers, yet the cleanliness issue continued;

{¶31} H.) K.L.'s parents have failed, for whatever reason to protect her from infection and serious physical harm. That K.L.'s parents are unwilling and/or unable to provide a safe and secure home for K.L. given her fragile condition;

{¶32} I.) K.L.'s Guardian Ad-litem recommends permanent custody of K.L. to PCDJFS;

{¶33} J.) K.L needs legally secure placement which cannot occur unless PCDJFS is granted permanent custody;

{¶34} K.) Reunification with K.L.'s parents is unlikely due to time constraints and their failure to provide a clean and suitable home for K.L.;

{¶35} L.) The child cannot express an opinion;

{¶36} M.) Following the placement of the child outside the child's home and notwithstanding reasonable case planning and diligent efforts by the agency to assist mother and father to remedy the problems that initially caused the child to be placed outside the home, mother and father have failed continuously and repeatedly to substantially remedy the conditions (clean and stable home) causing the child to be placed outside the child's home;

{¶37} N.) Portage County Department of Job and Family Services has made reasonable efforts in preventing the continued removal of the child from her home or to make it possible to return the child home;

{¶38} O.) There are no relatives or person who have been located or qualified that have shown an interest to be a relative placement or legal custodian.

{¶39} Father acknowledges that JFS met its burden of establishing one or more of the preliminary statutory factors set forth under R.C. 2151.414(B)(1); he maintains, however, the totality of the foregoing findings did not clearly and convincingly warrant the trial court's award of permanent custody to JFS. As such, he contends the trial court's judgment is against the manifest weight of the evidence. Specifically, father asserts he completed his "reunification plan." Regarding the issue of cleanliness, father asserts he and mother both testified they understand the import of keeping the home consistently clean for K.L.'s health and they have done so since November 2020. The evidence, however, does not support this contention.

{¶40} Between August and December 2020, Jennifer Waicak, mother's therapist with the Bair Foundation, visited the home some 12 times and observed that it was clean sometimes, but other times it was not. And Ms. Waicak agreed that there was no obvious period of time where the home was in a sustained state of cleanliness. Even if, as father insists, he and mother understand the importance of keeping the home clean such that K.L. would not run the risk of infection or illness, the evidence demonstrated they are unable to consistently meet this lofty goal.

{¶41} Furthermore, the backdrop of the case demonstrates the parents regularly failed to meet the required level of cleanliness for a child with K.L.'s various medical conditions. Ms. Lewis noted that she attempted to visit the parents' residence multiple times over the summer of 2020. And, although the parents were ostensibly separated during this time, she was unable to gain access. Still, Ms. Lewis asserted that, through the front door, she observed the home in a state of disarray. Mother acknowledged the

10

home can become messy, but "[w]hen the house gets like that it's due to being overwhelmed with things that are going on around me and my depression will set in * * *."

{¶42} Even though K.L. was not residing in the home during the summer and fall months of 2020, the foregoing evidence demonstrates that the parents are either unable or unwilling to establish a consistent, suitable environment for K.L. to thrive safely in light of her medical fragility. And, mother's admission that her depression, which is apparently ongoing, (as well as the potentially tumultuous nature of the parents' personal relationship) fundamentally affects whether the home is adequately clean or unacceptably dirty, there is no reasonable basis to conclude the home will ever be sufficiently clean to meet K.L.'s heightened needs. Father does not refute or even attempt to argue that, with his help, he and mother could overcome these problems. Indeed, the evidence reflected that father and mother resided with one another for a significant amount of the time K.L. was in JFS' temporary custody. If father had the wherewithal to remediate these issues, the caseworkers' testimony would have been much different.

{¶43} These points are compounded by mother's testimony that L.R.T. is medically compromised and on six different medications daily. If mother is psychologically strained and must administer L.R.T.'s various medications, the difficulties inherent in the parents keeping a consistently clean home *and* administering all the medications to each child are manifest.

{¶44} Moreover, although the court did not place heavy emphasis on the episode during which the parents administered expired medication to K.L., their admission that they were unaware it was expired and did not check the expiration also militates against father's argument that terminating his parental rights was error. While the oversight was

11

not intentional, his recognition that he did not check the expiration date was, at the least, unreasonable given K.L.'s extremely vulnerable medical condition. The same observation would apply to K.L.'s unclean feeding tube, which she had when she was returned from a visit with the parents in May 2020.

{¶45} In addition, the trial court overtly noted the GAL's recommendation. In recommending permanent custody to JFS, the GAL noted that the case commenced when K.L. was in need of a heart transplant and the parents were provided housing through the Cleveland Clinic at the Ronald McDonald House. And, due to the unsanitary nature of their living conditions, they were asked to leave. The GAL underscored that K.L. will have a lifetime of being immunocompromised and he expressed his concern that, even though the parents provided her with expired medications only once, the same error could occur again. And, in relation to this point, the GAL pointed out that, in administering the expired medication, he is worried that the parents do not fully understand the importance of monitoring the expiration date. The GAL stated that the Bair Foundation made unannounced visits on a monthly basis to the home and continued to find it unsanitary and unacceptable for K.L.'s needs. The GAL asserted his belief that JFS had done all it could to help the parents understand the import of the K.L.'s serious medical condition and the importance of keeping the living space extremely clean, but they have repeatedly failed to heed the advice and directives. As a result, the GAL recommended permanent custody to JFS.

{¶46} Although the parents testified that the condition of the home had been remedied, the court "doubt[ed] the credibility of the parents' testimony that the home was clean and suitable from late November to the present time." The court also pointed out that "[t]he Caseworker tried to revisit the home but was denied. The parents knowing

12

since 2018 that cleanliness of the home was a primary issue, did not document the home after late November 2020, nor brough[t] witnesses to testify about the condition of the home nor contacted PCDJFS to demonstrate the suitability of the cleanliness of the home." The trial court was in the best position to assess the credibility of the parents' testimony regarding the condition of the home. The trial court simply did not believe them or did not believe they could maintain a consistent level of cleanliness to permit unification with K.L., a seriously medically compromised young child.

{¶47} Given the foregoing, we conclude that, due to the severity of K.L.'s condition, which indisputably demands an extremely clean, if not immaculate, living environment as well as vigilant attentiveness to feeding and medication, there was clear and convincing evidence that awarding permanent custody to JFS was in the child's best interest.

{¶48} Father's assignment of error lacks merit.

{¶49} For the reasons discussed in this opinion, the judgment of the Portage County Court of Common Pleas, Juvenile Division, is affirmed.

MARY JANE TRAPP, P.J.,

THOMAS R. WRIGHT, J.,

concur.

13